EXHIBIT D
13

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| BRIANNA ARREDONDO, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 2:20-cv-07665-MCS-RAOx |
| | | Assigned to Hon. Mark C. Scarsi |
| vs. | ) ) | |
| THE UNIVERSITY OF LA VERNE | ) ) | |
| Defendant. | ) ) | |

# EXPERT REPORT OF

# BENJAMIN S. WILNER, Ph.D.

# **<u>Table of Contents</u>**

I. Introduction.................................................................................................................1

II. Qualifications ............................................................................................................1

III. Case Background .......................................................................................................2

   A. Tuition & Mandatory Fees .....................................................................................4

      1. Tuition...............................................................................................................4

      2. ASULV Fee .....................................................................................................4

      3. Student Health Insurance Fee ........................................................................5

      4. Various Other Fees .........................................................................................6

   B. The Plaintiff's Proposed Damages Theory.............................................................6

      1. The Plaintiff's Proposed Per Capita Tuition Damages Theory.....................6

      2. The Plaintiff's Proposed Per Capita Fee Damages Theory............................7

IV. Summary of Opinions ................................................................................................7

V. Actual Data Contradict the Plaintiff's Proposed Per Capita Tuition and Fee Damages Theory and Are Consistent with Putative Class Members Not Being Damaged ................................8

VI. The Plaintiff Has Not Quantified The Alleged Putative Class Members Nor Their Alleged Per Capita Loss ..............................................................................................9

VII. The Plaintiff's Proposed Per Capita Prorated Market Comparable Tuition Damages Theory Is Fatally Flawed...............................................................................10

   A. The Plaintiff's Market Comparable Methodology Is Fatally Flawed.....................10

      1. La Verne Online Is Not Comparable To ULV's Main Campus .....................11

      2. The Market Comparable Portion of Ms. Arredondo's Proposed Per Capita Prorated Market Comparable Tuition Damages Theory is a Highly Individualized Methodology 13

   B. The Plaintiff's Prorated Methodology Is Fatally Flawed .......................................19

      1. Marginal Utility Is Different For Each Student ...............................................19

      2. The Number of Relevant Days Is Individualized............................................19

VIII. The Plaintiff's Proposed Prorated Market Comparable Fee Damages Theory Is Fatally Flawed .20

   A. Students Received Value from the Portion of the Spring 2020 Semester After Main Campus ULV Allegedly Closed or Reduced Its Services ....................................21

      1. Contemporaneous Data Show That Putative Class Members Received Value from the Portion of the Spring 2020 Semester After Main Campus ULV Transitioned to Virtual Classes ..........................................................................21

2.   Even If There Were Some Diminishment in Value During the Time Main Campus ULV Allegedly Closed or Reduced Its Services, That Supposed Diminishment Would Be Highly Individualized ......................................................................................... 24

B.   The Number of Days Cannot Be Utilized to Calculate Prorated Damages ............................ 26

IX.   Even if Ms. Arredondo Were Able to Demonstrate that Main Campus ULV's Spring 2020 Semester Was Less Valuable in Some Way, Putative Class Members Were Not Necessarily Damaged .................................................................................................................................. 26

A.   Students Receiving Financial Aid Might Not Be Damaged ..................................................... 27

B.   Students Who Did Not Pay Their Own Tuition Would Not Be Damaged, Which Further Creates Individualized Issues .................................................................................................... 28

C.   Past Refunds Would Offset Any Alleged Damages ................................................................. 29

D.   The Named Plaintiff, Ms. Arredondo, Was Not Damaged Because She Received Financial Aid and COVID-19 Grants ....................................................................................................... 29

X.   Ms. Arredondo's Damages Theory Does Not Demonstrate That Main Campus ULV Was Unjustly Enriched ................................................................................................................... 32

XI.   Conclusion ............................................................................................................................... 32

EXHIBIT D

16

# I.    Introduction

Alvarez & Marsal Disputes and Investigations, LLC ("A&M") has been retained by counsel representing the Defendant, University of La Verne ("ULV"), to comment on the alleged damages in the aforementioned matter.  In particular, I, Benjamin S. Wilner Ph.D., have been asked to respond to the claim of Ms. Brianna Arredondo that all people who paid tuition and fees for or on behalf of students enrolled in classes at the Main Campus of ULV for the Spring 2020 Semester were economically damaged by ULV's Main Campus' transition to virtual classes in the Spring 2020 Semester and that damages can be formulaically determined on a class-wide basis.

Ms. Arredondo's proposed damages methodology is flawed along multiple dimensions.  First, it assumes that students would demand to pay less for virtual classes even though they actually exhibited contradictory behavior by paying similar amounts when confronted with a similar situation.  Second, at best, her proposed damages methodology assesses alleged per capita losses for one type of putative class member, Main Campus ULV undergraduates, for tuition, but not fees.  Not only does she not identify alleged per capita losses for other putative members, but she does not quantify the number of putative class members of each type.  Third, her proposed damages methodology is further flawed because it assumes that all students would view La Verne Online as a comparable education environment, when Ms. Arredondo exhibited views to the contrary. Fourth, Ms. Arredondo's proposed damages methodology incorrectly assesses the fraction of the Spring 2020 Semester that is relevant to online learning.  Not only does she improperly ignore the January portion of the Spring 2020 Semester, but she also overlooked other timing and valuation issues. Fifth, Ms. Arredondo ignored the values and services that ULV did provide when it offered virtual classes. Sixth, even if Ms. Arredondo were able to demonstrate that Main Campus ULV's Spring 2020 Semester was less valuable in some way, putative class members were not necessarily damaged.

I generated these conclusions by reviewing the documents listed in ***Exhibit 1***.  I reserve the right to modify and/or expand my opinions as I obtain and analyze additional information.

A&M is compensated for its services on an hourly basis and is being reimbursed for out-of-pocket expenses.  A&M is compensated at a rate of $695 per hour for my time.  Other individuals from A&M also provided assistance in this matter; their hourly rates range from $250 to $695.[1]

# II.    Qualifications

My curriculum vitae (***Exhibit 2***) details my credentials, testimony, publications and awards.

I am a Managing Director at A&M.  I have served as an expert witness and business consultant performing economic and statistical analyses in a great variety of engagements, including financial analysis, contract losses, and a wide range of class action, intellectual property, insurance claim,

---

[1] No one who has contributed to this engagement has any known financial interest in any party to the matter.  A&M's compensation is neither based nor contingent on the results of this analysis.  This Report is provided solely for use in the matter described in the caption at the top of this Report. This Report is not to be used with, circulated, quoted or otherwise referred to in whole or in part for any other purpose, or in any other document without the express written consent of A&M.

lost profits and lost income matters. I also received a special commendation from the Commissioner of U.S. Customs and Border Protection for revising a $2.5 billion annual tariff.

I hold a Bachelor of Arts degree, Magna cum Laude with Distinction in Major in Mathematics and Economics from the University of Pennsylvania as well as a General Course degree in Mathematics & Statistics from the London School of Economics. I was awarded a Ph.D. in Managerial Economics and Decision Science ("MEDS") from the Kellogg Graduate School of Management at Northwestern University. MEDS studies how consumers, governments and businesses make decisions in a wide variety of economic and other environments.

I served as a professor of economics, finance and statistics at the University of Michigan, the University of Iowa, Northwestern University and the Helsinki School of Economics.

My research has been published in peer reviewed academic journals including the *Journal of Finance*, the leading academic journal on the subject of finance. I have been awarded research grants from multiple universities and the National Science Foundation ("NSF"). My research has been cited by over 800 papers.[2] I also served as a referee for multiple academic journals and textbooks.

One of my areas of research was experimental economics, which is the application of experimental methods to study economic questions that arise in real-world situations. For my NSF grant, my coauthors and I statistically analyzed data from a consumer buying behavior survey we conducted that determined the prices respondents would pay for products that could be sold in bundles. My undergraduate advisor, Colin Camerer, a MacArthur Genius Award Winner, utilizes experimental economics to study psychological forces and their deeper neuroscientific foundations that influence economic decisions involving individuals and markets. The former President of the University of Chicago relied on my undergraduate thesis as the theoretical basis for one of his published research papers on utilizing experimental economics surveys to generate economic conclusions.

As an undergraduate, I spent three years as a research assistant to the 1980 Nobel Prize winner Lawrence R. Klein. Dr. Klein was awarded the Nobel Prize in Economics for economic and statistical forecasting. As a graduate student, I studied under Roger Myerson, who won the 2007 Nobel Prize in Economics for analyzing environments that cause respondents to truthfully and accurately reveal their full preferences, and Dale Mortensen, who won the 2010 Nobel Prize in Economics for his study of labor markets.

# III. Case Background

COVID-19 caused business and school disruptions throughout the country, especially during the Spring of 2020. ULV's Main Campus was no exception.

ULV's Spring 2020 Semester was comprised of two periods: 1) the "January Interterm 2020," which began on January 3rd and 2) the "Spring 2020," which began on February 3rd and lasted

---

[2] https://scholar.google.com/scholar?hl=en&as_sdt=0%2C14&q=benjamin+wilner&btnG= viewed on December 23, 2021.

through May.[3]  The January Interterm is a four-week term that allows students to take up to five additional course hours prior to the beginning of "Spring 2020."  Consequently, the full Spring 2020 Semester comprised both periods.  As discussed below, Ms. Arredondo's damages theory incorrectly assumes that the Spring 2020 Semester began in February.

On March 13, 2020, the United States federal government declared a national emergency in response to COVID-19.[4]  ULV's Main Campus complied by notifying students on Friday, March 13, 2020 that classes would transition to virtual instruction after Spring Break and asking students to vacate their dormitories by March 20, 2020.[5]  Since this transition occurred over Spring Break (March 16 – 22), classes still resumed as scheduled on Monday, March 23, 2020.[6]

Ms. Arredondo was a standing senior during the Spring 2020 Semester pursuing a Bachelor's degree in business administration.[7]  Ms. Arredondo completed her Spring 2020 courses at ULV's Main Campus.  She opted not to take classes at ULV's Main Campus during the Summer 2020 Term, but independently elected to take online classes at Brigham Young University.  Ms. Arredondo then resumed virtual classes back at ULV's Main Campus in the Fall 2020 Semester.[8]  With all of these classes she elected to take, Ms. Arredondo graduated in January 2021 as planned.  Her education was sufficient to allow her to become a legal assistant at a law firm in Los Angeles.[9]

With the transition to virtual classes, Main Campus ULV refunded students sizable funds.  In addition to refunding a portion of the room & board students living on campus were assessed and a portion of the Associated Students of the University of La Verne ("ASULV") Fee traditional undergraduates were assessed,[10] Main Campus ULV provided CARES / COVID-19-related grants to students upon request to assist with financial needs arising because of COVID-19 and the transition to virtual classes.[11]

However, not satisfied with these refunds, Ms. Arredondo filed this lawsuit seeking to certify a class of "All persons who paid tuition and/or the Mandatory Fees at La Verne's Main/Central campus location during the Spring 2020 term/semester"[12] claiming that Main Campus ULV should provide them additional refunds.  Section A below provides a background on the "tuition and/or Mandatory Fees" allegedly at issue in this case.  Section B summarizes Plaintiff's Proposed Damages Theories.

---

[3] 2019-2020 Catalog.pdf, p. 3 (ULV 000038).
[4] https://laverne.edu/health/2020/urgent-novel-coronavirus-update/ viewed on January 5, 2022.
[5]    https://laverne.edu/health/2020/urgent-novel-coronavirus-update/   and   https://laverne.edu/health/2020/all-university-of-la-verne-classes-to-move-online/ both viewed on January 5, 2022.
[6] 2019-2020 Catalog.pdf, p. 3 (ULV 000038).
[7] ULV 000015 and Deposition of Brianna Arredondo ("Arredondo Deposition"), p. 61.
[8] Arredondo Deposition, p. 37, 126-127, 170.
[9] Id., p. 22-23, 51.
[10]    https://laverne.edu/health/2020/memo-to-resident-students/   viewed   on   January   5,   2022, https://laverne.edu/health/2020/an-update-from-president-lieberman-2/ viewed on January 5, 2022 and Memorandum Of Points And Authorities In Support Of Plaintiff's Motion For Class Certification, p. 3.
[11] ULV 002541-ULV 002542.
[12] Memorandum Of Points And Authorities In Support Of Plaintiff's Motion For Class Certification, p. 2.

## A.   Tuition & Mandatory Fees

There are several distinct components of the "tuition and/or Mandatory Fees" allegedly at issue in this matter.  I describe them below.  In addition to tuition, Ms. Arredondo states that Mandatory Fees include the ASULV Fee, Student Health Insurance Fee and various other fees.[13]  I present the List Prices of these tuition and fees for the Spring 2020 Semester below.  As noted in Section VII.A.2.c below, most students do not pay these List Prices.

Main Campus ULV posted different List Prices for the Spring 2020 Semester for its tuition and fees based upon student status.  For example, some Main Campus ULV students, such as part-time undergraduates and graduate students, were not assessed certain fees.  As Ms. Arredondo was a full-time undergraduate at the ULV Main Campus and it is my understanding that the Plaintiff has not discussed tuition and fees for other students, I limit my discussion of these tuition and fees to full-time undergraduates at the ULV Main Campus.  I reserve the right to update my analyses if and when the Plaintiff proposes a methodology for other students' refunds.

### 1.   Tuition

Main Campus ULV posted different List Prices for the Spring 2020 Semester for its tuition based upon student status.  In the Spring 2020 Semester, the List Price for tuition for traditional full-time undergraduate ULV students at the Main campus was $21,720.[14]

As mentioned above, the Spring Semester is composed of two periods: the "January Interterm 2020" and "Spring 2020."  Students are not assessed additional tuition for "January Interterm 2020" classes.  In other words, the tuition for these course hours would have been included in the $21,720 List Price for Spring 2020.

Even though Main Campus ULV does not charge tuition on a per credit hour basis, the List Price it charges for a semester is equivalent to a $944 to $1,810 per credit hour List Price as full-time undergraduate could be enrolled in 12 – 23 course hours in a semester.[15]

As discussed below in Section IX.D, Ms. Arredondo only paid a fraction of the List Price for tuition.

### 2.   ASULV Fee

ASULV is the governing body representing and advocating for the traditional undergraduate student body on the main campus.[16]  The purpose of the ASULV Fee or the Student Activity Fee

> is to provide funds to improve the co-curricular environment for all undergraduate students.  The money from the activity fee goes back to all undergraduate students in the form of events, programs and activities.  All student-held events on campus are funded through the student activity fee.  The fee allows ASULV to fund CAB

---

[13] Second Amended Class Action Complaint, paragraph 2.
[14] 2019-2020 Catalog.pdf, p. 34 (ULV 000067).
[15] In the Spring 2020 Semester, a full-time undergraduate student could take 5 course hours in the January Interterm and 18 hours in Spring 2020 (see 2019-2020 Catalog.pdf, p. 6 (ULV 000039) & p. 34 (ULV 000067)).
[16] 2019-2020 Catalog.pdf, p. 14 (ULV 000047).

and all recognized clubs on campus, put on LaVernapalooza, hold events with food and giveaways, improve the campus and more.  A budget is created with the student activity fee every year and is voted through by the ASULV Senate.[17]

The List Price for the ASULV Fee the ASULV Senate agreed to was $160 for all full-time undergraduate students for the Spring 2020 Semester.[18]  As discussed above, Main Campus ULV previously refunded students $100 of the ASULV Fee for Spring 2020.  Consequently, students who paid the full List Price of the ASULV Fee have already received a 62.5% refund on this Fee.

Ms. Arredondo was assessed the ASULV Fee in the Spring 2020 Semester, but, as discussed below in Section IX.D, potentially only paid 32% of the List Price.  Despite paying only a fraction of the $160 List Price, she still received the full $100 refund.[19]  As a result, she has already received a 195% refund on this Fee (=$100/($160*32%)).

*Figure 1* shows the allocation of the ASULV funds by activity that the ASULV Senate agreed to.

| Figure 1 Allocation of ASULV Fee [20] | |
|---|---|
| **Fee Allocation** | **Percentage** |
| Campus Activities Board Funding | 38.80% |
| Club Funding | 16.74% |
| Signature Concert Event | 14.95% |
| Greek Funding | 5.80% |
| Public Relations | 4.18% |
| Catering | 3.59% |
| Special Events | 2.99% |
| ASULV Future Leaders Scholarship | 2.39% |
| Campus Improvements | 2.39% |
| Student Workers / Stipends | 2.20% |
| Incentives / End of the Year | 1.02% |
| SOT Funding | 0.96% |
| Supplies / Misc. | 0.96% |
| Elections | 0.84% |
| ASULV Training | 0.66% |
| Marketing | 0.60% |
| Conferences | 0.48% |
| Senate Resources | 0.48% |

### 3.   *Student Health Insurance Fee*

The Student Health Insurance Fee enrolls full-time, traditional aged undergraduates in the University Student Medical Insurance ("USMI") Plan.[21]   This Plan provides students with free

---

[17] https://laverne.edu/student-life/asulv/student-activity-fee/ viewed on December 21, 2021.
[18] 2019-2020 Catalog.pdf, p. 34 (ULV 000067).
[19] ULV 000007-11 (Arredondo Student Account Info).pdf, p. 1 (ULV 000007).
[20] https://laverne.edu/student-life/asulv/student-activity-fee/ viewed on December 21, 2021.
[21] https://laverne.edu/health/ viewed on December 23, 2021.

healthcare through Main Campus ULV's Student Health Services ("SHS").  In particular, students enrolled in the Plan incur no out-of-pocket charges for services rendered through SHS and for prescription medications provided by its pharmacy.[22]

The List Price for the Student Health Insurance Fee was $395 for the Spring 2020 Semester.[23] Ms. Arredondo was assessed the Student Health Insurance Fee in the Spring 2020 Semester, but as discussed below in Section IX.D, potentially only paid a fraction of this List Price.

### 4. Various Other Fees

Other fees fall into a couple of buckets.  First, there are fees not charged to full-time undergraduates at the ULV Main Campus.  Second, some courses require additional lab or other fees.  Third, Main Campus ULV assessed certain fees for one-time events such as applications, transcripts and returned checks /rejected credit cards.  *Exhibit 3* identifies these other fees.

During the Spring 2020 Semester, Ms. Arredondo was assessed a Graduation Fee and a Deferment Fee.

## B. The Plaintiff's Proposed Damages Theory

Ms. Arredondo alleges that common damages theory could be uniformly utilized to assess the losses all Main Campus ULV undergraduates allegedly suffered.

However, she only discussed **part of** a complete damages model.  A complete damages model in a tuition class action identifies a) the putative class members who were damaged and b) the losses each putative class member allegedly suffered.  While she did not identify the quantity and characteristics (e.g., graduate student, part-time undergraduate, non-attending tuition funder) of putative class members, she provided a framework to calculate the per capita damages associated with one student type, Main Campus ULV undergraduates.  I discuss her proposed Per Capita Tuition and Fee Damages Theories in subsections 1 and 2 below.

### 1. The Plaintiff's Proposed Per Capita Tuition Damages Theory

Ms. Arredondo proposes a Per Capita Prorated Market Comparable Tuition Damages Theory. While identifying the broad framework of this Theory, she did not perform the full calculation of alleged damages under this Theory.  As a result, she did identify the difficulties in implementing this Theory.

Her Per Capita Prorated Market Comparable Tuition Damages Theory begins by alleging that all Main Campus ULV undergraduates would view ULV's online-only education program called "La Verne Online" as being comparable to the education they received during the virtual portion of the Spring 2020 Semester.  As the List Price of tuition for La Verne Online allegedly is 56.7% less than the List Price for tuition for traditional full-time undergraduate ULV students at the Main campus,[24] Ms. Arredondo alleges that traditional full-time undergraduate ULV students at the

---

[22] https://laverne.edu/health/ viewed on December 23, 2021.
[23] 2019-2020 Catalog.pdf, p. 34 (ULV 000067).
[24] Memorandum Of Points And Authorities In Support Of Plaintiff's Motion For Class Certification, p. 27.

Main campus only received 43.3% of what they paid for during the virtual portion of the Spring 2020 Semester.

She goes on to allege that the virtual portion of the Spring 2020 Semester accounted for 64% of the entire Semester.[25]

As a result, Ms. Arredondo claims that all Main Campus ULV undergraduates should receive a 36.3% (=64% x 56.7%) refund on tuition for the Spring 2020 Semester. For example, the List Price of Ms. Arredondo's Spring 2020 Semester tuition was $21,720. As a result, she claims that she should receive a refund of $7,882. In other words, Ms. Arredondo's Per Capita Prorated Market Comparable Tuition Damages Theory claims that she received $13,838 in value from her Spring 2020 Semester classes.

No tuition calculations were performed for any other student type.

## 2.  *The Plaintiff's Proposed Per Capita Fee Damages Theory*

Ms. Arredondo does not propose any theory to assess Main Campus ULV's alleged fee overcharge for the Spring 2020 Semester. It is unclear whether she intends to utilize the percentage calculated by comparing tuition List Prices discussed in the prior subsection in her Fee Damages Theory.

# IV.  Summary of Opinions

I continue this Expert Report by critiquing the framework of the Plaintiff's Proposed damages theories. I reserve the right to update my opinions if and when a complete damages model is put forward.

Section V below demonstrates that irrespective of any model details Ms. Arredondo might provide, actual data show that putative class members were not damaged. Section VI explains how Ms. Arredondo has not put forth a proper damages model. Section VII and VIII discuss the fundamental flaws with Ms. Arredondo's proposed tuition and fee damages model, respectively. Section IX shows that even if Ms. Arredondo could show that virtual classes were less valuable than in-person classes, putative class members still might not have been damaged. Section X shows that a complex analysis would be required to determine if Main Campus ULV was unjustly enriched, and that such an analysis is not covered by Ms. Arredondo's damages theory.

---

[25] Id., p. 25-26.

# V.   Actual Data Contradict the Plaintiff's Proposed Per Capita Tuition and Fee Damages Theory and Are Consistent with Putative Class Members Not Being Damaged

As taught to me by someone who won the Nobel Prize for economic and statistical forecasting, it is generally preferrable to base economic conclusions on actual data rather than hypothetical, often complex models, which regularly contain a large number of explicit and implicit assumptions.

Consequently, notwithstanding the per capita damages theory Ms. Arredondo put forward based upon a hypothetical comparison, actual, contemporaneous data demonstrate that Main Campus ULV undergraduates would pay a similar amount in tuition and fees for virtual classes and services as they did for in-person classes and services.

The Plaintiff's Motion for Class Certification hypothesizes that Main Campus ULV undergraduates would have paid less if they had known that they would have virtual classes for at least part of the Spring 2020 Semester.

There is no reason to construct damages models to investigate such a hypothetical.  Almost all Main Campus ULV undergraduates were **actually** confronted with such a question.  As a result, one only has to look at their actual behavior to determine if there would be a price reaction to students receiving virtual classes and services.  As discussed below, actual behavior suggests that there would not be a material price reduction.

In particular, Main Campus ULV undergraduates were asked such a question prior to the Fall 2020 Semester.  Before paying Fall 2020 Semester tuition and fees, Main Campus ULV undergraduates knew that they would have some virtual classes and not have access to full campus activities for part of that Semester.  For example, on July 28, 2020, 34 days before the start of the Fall 2020 Semester, Main Campus ULV announced that it would begin that Semester with primarily virtual instruction and only essential on-campus operations.[26]  Ms. Arredondo testified that she was aware that such an educational environment may exist prior to the start of the Fall 2020 Semester.[27]  This Fall 2020 Semester educational environment was similar to the one that Main Campus ULV undergraduates experienced during the virtual class portion of the Spring 2020 Semester at issue in this lawsuit.

Not only was the educational environment in the Fall 2020 Semester similar to the one that Main Campus ULV undergraduates experienced during the virtual class portion of the Spring 2020 Semester at issue in this lawsuit, but the Main Campus of the ULV's List Prices were approximately 3% greater in the Fall 2020 Semester than in the Spring 2020 Semester.[28]

---

[26] https://laverne.edu/health/2020/la-verne-safe-return-update-2/ viewed on January 10, 2022.
[27]  Arredondo Deposition, p. 170.
[28] ULV 000067 & ULV00328. Main Campus ULV increased List Price Tuition and the Student Health Insurance Fee by $630 and $20, respectively. Subsequently, Main Campus ULV offered $1,000 grants to full-time traditional age undergraduate students.  If the student accepted the grant, this netted to a $350, or 1.57%, decrease in tuition and fees.

Consequently, all non-graduating Spring 2020 Semester Main Campus ULV undergraduates, including Ms. Arredondo, had to decide prior to the Fall 2020 Semester whether to enroll at the Main Campus of ULV for that Semester and to be taught in an education environment similar to the one for which she claims they were overcharged, but knowing that they would face similar List Prices.[29]   In particular, all Main Campus ULV undergraduates were, in effect, posed with the following question prior to the Fall 2020 Semester:

> *Will you pay full tuition for the Fall 2020 Semester knowing that you will not have full access to campus facilities and some classes will be taught virtually?*

Main Campus ULV enrollment data demonstrate that **MOST** Main Campus ULV undergraduates **AGREED** to be charged similar prices to receive an education similar to the one for which they claim they were overcharged.  In particular, 78% of first year Main Campus ULV undergraduates reenroll for the Fall 2020 Semester from the prior academic year.[30]

This fact contradicts the Plaintiff's claim.  Main Campus ULV undergraduates' **actual decisions** demonstrate that they did not believe they were overcharged for the education they received during the virtual portion of the Spring 2020 Semester.  Consequently, at a minimum, any student who reenrolled at ULV's Main Campus for the Fall 2020 Semester, like Ms. Arredondo, was not damaged by Main Campus ULV's alleged actions and should be excluded from the putative class.

Individualized analyses would be required to determine whether any Main Campus ULV undergraduates who did not reenroll for the Fall 2020 Semester should be part of the putative class.  COVID-19 and virtual education might not be the reason for their withdrawal as many students elect to not reenroll for other reasons.[31]

# VI.   The Plaintiff Has Not Quantified The Alleged Putative Class Members Nor Their Alleged Per Capita Loss

As discussed above, in order to properly calculate damages in a tuition and fee class action, one must at least identify the quantity of putative class members as well as the losses per putative class member.  Ms. Arredondo has done neither.  At best, she has provided some elements of information about losses for one putative class member type for one item they paid for.

First, Ms. Arredondo has not identified the number of putative class members.  As mentioned above, Ms. Arredondo believes that the putative class is:

> All persons who paid tuition and/or the Mandatory Fees at La Verne's Main/Central campus location during the Spring 2020 term/semester.[32]

She did not identify all the alleged **payors** of "tuition and/or Mandatory Fees at La Verne's Main/Central campus location during the Spring 2020 term/semester."  She performed no analysis

---

[29] https://laverne.edu/health/2020/la-verne-safe-return-update-2/ viewed on January 10, 2022.
[30] https://nces.ed.gov/ipeds/datacenter/InstitutionProfile.aspx?unitid=117140 viewed on January 11, 2022.  Main Campus ULV only tracks annual retention rates for first year undergraduates from the Fall of each year.
[31] https://collegestats.org/articles/beware-the-top-5-reasons-for-dropping-out-of-college/ viewed on August 9, 2021.
[32] Memorandum Of Points And Authorities In Support Of Plaintiff's Motion For Class Certification, p. 2.

to demonstrate which students paid their tuition and fees on their own versus a third party. A third party could include parents, other relatives or even providers of financial aid, such as ULV itself or the government.

Second, Ms. Arredondo has not properly calculated the losses per each putative class member.

Ms. Arredondo has only calculated what she believes is the alleged tuition loss per person for traditional undergraduate students at Main Campus ULV. However, she has not calculated what she believes is the alleged tuition loss for other putative class members, such as part-time undergraduate students, graduate students or other third-party payors.

As mentioned above, Ms. Arredondo also does not calculate specifically the alleged fee losses for any putative class member.

As a result, even though Ms. Arredondo posited the damages theory summarized above in Section III.B., as it is inadequate, I am unable to assess required details. Ms. Arredondo provided no evidentiary proof or rigorous analyses to demonstrate that this theory would be relevant to the task at hand, rest on a reliable foundation, would be the product of sound scientific methodology that is generally accepted by the scientific community or has been subjected to peer review. I also cannot test the reliability of this theory or know its underlying error rate.

Without required model details, Ms. Arredondo did not demonstrate that the alleged injury is measurable on a class-wide basis or that individualized issues do not preclude her from doing so. In the report sections below, I demonstrate the fatal flaws in the elements of the portion of a damages theory Ms. Arredondo did present, which will end up precluding her from accurately identifying the putative class members as well as measuring the alleged losses per person. I reserve the right to expand my opinions when and if she provides the other elements required to quantify alleged damages.

# VII. The Plaintiff's Proposed Per Capita Prorated Market Comparable Tuition Damages Theory Is Fatally Flawed

Notwithstanding the above, I discuss the flaws in Ms. Arredondo's Proposed Per Capita Prorated Market Comparable Tuition Damages Theory as well as the individualized issues that are required to employ this Theory below. I separately discuss the Market Comparable portion and the Prorated Portion of this Theory below in Sections A and B, respectively.

## A.    The Plaintiff's Market Comparable Methodology Is Fatally Flawed

As discussed above, the Market Comparable portion of Ms. Arredondo's Proposed Per Capita Prorated Market Comparable Tuition Damages Theory assumes that all Main Campus ULV undergraduates would view ULV's online-only education program called "La Verne Online" as being comparable to the education they received during the virtual portion of the Spring 2020 Semester.

This assumption is flawed along several dimensions.

### 1.      *La Verne Online Is Not Comparable To ULV's Main Campus*

The Market Comparable portion of Ms. Arredondo's Proposed Per Capita Prorated Market Comparable Tuition Damages Theory is an application of the standard Yardstick or Benchmark Method of calculating damages. Under this Method, the damages expert must demonstrate that the "comparable" university is sufficiently comparable to ULV's Main Campus and that any tuition and fee difference that might exist could not be explained by other factors.[33]

Not only has Ms. Arredondo not demonstrated the comparability of La Verne Online and Main Campus ULV, but a brief analysis of the two programs demonstrates that they are not sufficiently comparable. The differences between La Verne Online and Main Campus ULV could explain the List Price differences between the programs.

Consequently, standard damages authorities identify a fatal flaw in Ms. Arredondo's Proposed Per Capita Prorated Market Comparable Tuition Damages Theory.

La Verne Online and Main Campus ULV are different along several dimensions. Individualized analyses would be required to determine if each particular putative class member would find La Verne Online and Main Campus ULV "comparable."

First, La Verne Online and Main Campus ULV target different students. While 79% of Main Campus ULV's undergraduates are full-time students,[34] 45% of La Verne Online students are.[35] While Main Campus ULV aims to enroll first-time and transfer undergraduate students seeking a Bachelor's or graduate degree, La Verne Online is designed for non-traditional students, such as working professional adults or people with busy schedules.[36] As a result, many Main Campus ULV undergraduates would not find La Verne Online to be a "comparable" university because they desired to be a full-time student. At a minimum, individualized analyses would be required to determine the type of student each putative class member was in order to assess comparability.

Second, La Verne Online and Main Campus ULV offer different classes. While Main Campus ULV offered 504 different classes during the Spring 2020 Semester, La Verne Online offered only 67 classes.[37] Additionally, Main Campus ULV's classes are more diverse as it offers classes in 50 different majors with a variety of minors available.[38] La Verne Online only offers classes in 6 different majors.[39] As a result, many Main Campus ULV undergraduates would not find La Verne Online to be a "comparable" university because it did not offer the same classes they took during the Spring 2020 Semester. Main Campus ULV undergraduates have a greater variety of classes and majors compared to La Verne Online. Additionally, the fewer majors offered by La Verne Online would prevent many putative class members from pursuing their intended degrees at La Verne Online, further weakening their comparability. Consequently, at a minimum,

[33] Pollack, R., Bouchner, S., Enos, C., Johns, C. & Moyl, J. Calculating Lost Profits. *AICPA Business Valuation and Forensic & Litigation Services Section Practice Aid* 06-4 (2013), paragraphs 68 – 69.
[34]     https://nces.ed.gov/collegenavigator/?q=university+of+la+verne&s=all&id=117140#expenses     viewed     on December 30, 2021.
[35] Correspondence from ULV Representative, Xochitl Martinez, dated January 17, 2022 (Full-Time Online Students).
[36] Plaintiff's Motion for Class Certification, Exhibit X.
[37] Correspondence from ULV Representative, Xochitl Martinez, dated January 17, 2022 (ULV Online vs. ULV Main Campus Classes.pdf).
[38] https://laverne.edu/programs/ viewed on January 10, 2022.
[39] Course Catalog 2019-20.pdf, p. 12 (ULV 000045).

individualized analyses would be required to determine each putative class member's field of study and their Spring 2020 Semester classes outside that field of study in order to assess comparability.

Third, La Verne Online and Main Campus ULV offer different degrees. Some La Verne Online students are enrolled in its general studies Associate's Degree program, while Main Campus ULV does not offer an Associate's Degree.[40] As a result, many Main Campus ULV undergraduates would not find La Verne Online to be a "comparable" university because the latter emphasized a degree they were not pursuing. At a minimum, individualized analyses would be required to determine each putative class member's desire to "attend" a university whose focus to some was equivalent to that of a community college in order to assess comparability.

Fourth, La Verne Online is not authorized in 28 states in the United States.[41] ULV students would not be able to take La Verne Online classes if they resided in non-authorized states after March 16, 2020, while they would be able to take classes from Main Campus ULV. Consequently, this authorization limitation would prevent Main Campus ULV undergraduates residing in non-authorized states from even being able to utilize La Verne Online as a "comparable" university. As a result, many Main Campus ULV undergraduates would not find La Verne Online to be a "comparable" university because of their geographic location. At a minimum, individualized analyses would be required to determine the geographic location of each student on each day of class attendance in order to assess comparability.

Fifth, La Verne Online and ULV Main Campus set the List Price of their tuitions differently. While La Verne Online's tuition List Prices are set on a per credit hour basis to accommodate more part-time students,[42] Main Campus ULV's tuition List Prices are set on a semester-long basis. Ms. Arredondo has not addressed how her Proposed Per Capita Prorated Market Comparable Tuition Damages Theory would accommodate such tuition structure differences. At a minimum, individualized analyses would be required to determine the type of student each putative class member was in order to assess comparability.

Sixth, Main Campus ULV offers substantially more institutional financial aid to traditional undergraduate students than La Verne Online does.[43] As discussed below in Section VII.A.2.c, 98% of Main Campus ULV's full-time, first-time undergraduate students received financial aid from ULV during the 2019-2020 academic year.[44] On the other hand, it is my understanding that La Verne Online only offers minimal financial aid. As a result, most Main Campus ULV undergraduates would not find La Verne Online to be a "comparable" university because they received substantially more financial aid from ULV than they would from La Verne Online. Consequently, La Verne Online would be more expensive for some Main Campus ULV undergraduates as the financial aid they received causes their out-of-pocket expenditures to attend Main Campus ULV to be less than the full List Price they potentially would have to pay to attend La Verne Online, resulting in negative damages if La Verne Online were used as a comparable. At a minimum, individualized analyses would be required to determine each putative class member's financial aid in order to assess comparability. Further individualization would be

---

[40] Correspondence from ULV Representative, Xochitl Martinez, dated January 17, 2022 (Full-Time Online Students).
[41] https://laverne.edu/online/state-authorization/ viewed on January 5, 2022.
[42] 2019-2020 Catalog.pdf, p. 35 (ULV 000068).
[43] Martinez Declaration, paragraph 10 & Correspondence from ULV Representative, Xochitl Martinez, dated January 17, 2022 (La Verne Online Grants.pdf).
[44] https://nces.ed.gov/ipeds/datacenter/InstitutionProfile.aspx?unitid=117140 viewed on January 11, 2022.

required because as discussed in Section IX.A, financial aid would need to be recalculated if a Main Campus ULV student's Cost of Attendance changed as it would if it was charged La Verne Online List Prices.

Consequently, the classes, structure, degrees and value received from La Verne Online and Main Campus ULV are vastly different; thus, any damages theory that attempts to compare the two programs would be fatally flawed.

In fact, Ms. Arredondo's actions are consistent with La Verne Online not being comparable to Main Campus ULV.  Ms. Arredondo testified that she needed to take classes during the Summer 2020 and Fall 2020 Semesters in order to complete her degree as planned.[45]   Ms. Arredondo opted to take online classes at BYU online during the Summer 2020 Semester.[46]  She opted to take classes at Main Campus ULV during the Fall 2020 Semester even though she was aware that Main Campus ULV classes would be virtual.  Furthermore, Ms. Arredondo admitted that the coursework she needed to complete her Main Campus ULV degree was not available through La Verne Online, much less the coursework of the entire putative class.[47]

As a result, Ms. Arredondo's actions suggest that, at least for her, BYU online and Main Campus ULV with virtual classes would be a better comparable than La Verne Online.  Standard damages authorities call a Benchmark or Yardstick damages model like the Plaintiff's Proposed Per Capita Prorated Market Comparable Tuition Damages Theory flawed if a more appropriate comparable was not utilized.[48]

Individualized analyses would be required to determine the proper comparable for each student as one might find UCLA online to be the "best" comparable, while another student might prefer the University of Phoenix.

Furthermore, Marketing 101 states that institutions charge different prices when products and services are sold to different consumer types.[49]   As a result, the aforementioned differences in classes, structure, degrees and value for La Verne Online and Main Campus ULV could account for any List Price differences between the two programs.  The University could have set La Verne Online List Prices to be more comparable to Main Campus ULV prices if the characteristics of the former's students were more similar to those of the latter.

## 2. *The Market Comparable Portion of Ms. Arredondo's Proposed Per Capita Prorated Market Comparable Tuition Damages Theory is a Highly Individualized Methodology*

Even if one could identify the one unique, common "comparable" university necessary to apply Ms. Arredondo's Proposed Per Capita Prorated Market Comparable Tuition Damages Theory, she

---

[45] Arredondo Deposition, p. 170.
[46] Id., p. 248.
[47] Id., p. 61.
[48] Pollack, R., Bouchner, S., Enos, C., Johns, C. & Moyl, J. Calculating Lost Profits. *AICPA Business Valuation and Forensic & Litigation Services Section Practice Aid* 06-4 (2013), paragraphs 68 – 69.
[49]   https://www.investopedia.com/ask/answers/042415/what-are-different-types-price-discrimination-and-how-are-they-used.asp viewed on January 13, 2022.

would not be able to calculate the difference in tuition and fees between that university and Main Campus ULV without investigating individualized issues.

In addition to the individualized issues discussed in the prior subsection, I identify additional individualized issues below.  In particular, subsection a below discusses the demonstrated value that Main Campus ULV undergraduates received in Spring 2020.  Subsection b shows that even if there were some diminishment in value during the virtual class portion of the Spring 2020 Semester, that diminishment would be highly individualized.  Subsection c further shows that the prices putative class members actually paid were highly individualized.

  **a.**  ***Contemporaneous Data Show That Putative Class Members Received Significant Value from the Virtual Class Portion of the Spring 2020 Semester***

First, customers tend to complain when they do not receive the value they expected from the products and services they purchased.  These complaints frequently go to the customers' point of contact even if that individual was not responsible for the decreased value.  For example, customer call center personnel receive complaints about poor products and service.  Restaurant waitstaff can receive lower tips even if a chef made an error.

Each semester Main Campus ULV surveys its students asking them to rate their courses on a scale of 1 to 4, with 4 being the highest rating.  Consequently, one would expect that if students felt that they received lesser value from the virtual class portion of the Spring 2020 Semester, they would give their courses lower ratings.  However, this was not the case.  As shown in ***Figure 2*** below, Main Campus ULV data show that course ratings during the Spring 2020 Semester increased from Fall 2019 and were consistent with prior Spring semesters.  Additionally, Fall 2020's ratings continued to increase when there was ongoing virtual learning at the ULV Main Campus.[50]

| Figure 2 Average Course Evaluations | | | |
|---|---|---|---|
| Semester | 2018-2019 | 2019-2020 | 2020-2021 |
| Fall | 3.54 | 3.55 | 3.61 |
| Spring | 3.60 | 3.59 | 3.58 |

Consequently, the general Main Campus ULV student body's course ratings are inconsistent with putative class members receiving diminished value from the virtual class portion of the Spring 2020 Semester.

Second, at its core, the aim of Main Campus ULV's classes is to educate students.  One way to measure education is through students' Grade Point Average ("GPA").  Students who learn more generally receive higher grades.  ***Figure 3*** below shows that average traditional undergraduate student GPAs increased from 3.15 in Fall 2019 to 3.36 in Spring 2020, and Spring 2020 was the highest GPA of all other recent semesters.[51]  In addition, Ms. Arredondo's achieved a 3.80 GPA

---

[50] Correspondence from ULV Representative, Daniel Byrd, Ph.D., dated January 13, 2022 (Main Campus Undergraduate Course Evaluations.pdf).

[51] Correspondence from ULV Representative, Daniel Byrd, Ph.D., dated January 13, 2022 (Traditional Undergraduate GPAs.pdf).

in Spring 2020, which was the first and only time she made the Dean's List.[52]  Such data are consistent with students' education not diminishing during the virtual class portion of the Spring 2020 Semester.[53]

| Figure 3 Average Semester GPA | | | | |
|---|---|---|---|---|
| Semester | 2017-2018 | 2018-2019 | 2019-2020 | 2020-2021 |
| Fall | 3.16 | 3.14 | 3.15 | 3.18 |
| Spring | 3.16 | 3.17 | 3.36 | 3.20 |

Third, Ms. Arredondo's theory that students receive diminished value from virtual classes is inconsistent with Nobel Prize-winning research.  In 1973, Michael Spence published a paper called "Job Market Signaling" in the *Quarterly Journal of Economics* for which he won the 2001 Nobel Prize in Economics.[54]  Dr. Spence, who was Dean of Stanford Business School, concluded in this paper that students do not need to learn anything for universities to confer value as completing an education conveys information about a student's inherent abilities.  He demonstrated that because more advanced individuals would have an easier time completing college than their less advanced counterparts, the latter would not attend universities.  Thus, college completion signals a student's strength even if college did not make them intellectually stronger.  This conclusion continues to hold as *New York Magazine* wrote in May 2020 that "no one has really come up with the ability to certify [potential hires] to the same extent that universities[' admissions departments] do."[55]

In fact, 542, or almost a quarter, of all Main Campus ULV undergraduate students still graduated after the Spring 2020 Semester.[56]

Because Ms. Arredondo has not disputed that a degree from ULV's Main Campus still provides a strong signal about a student's ability that allowed her to obtain employment, she cannot claim that students received a diminished value from the virtual class portion of the Spring 2020 Semester.

### b.   Even If There Were Some Diminishment in Value During the Virtual Class Portion of the Spring 2020 Semester, That Diminishment Would Be Highly Individualized

First, Ms. Arredondo testified that virtual classes were "different" than in person classes and not necessarily of lesser value.[57]  During the virtual portion of Spring 2020 Semester, Ms. Arredondo admitted that some students attended classes via Zoom; some viewed previously recorded lectures.  As a result, putative class members were not similarly situated with what their educational environment was during the virtual class portion of the Spring 2020 Semester and how that environment compared to the first portion of the Spring 2020 Semester. Additionally, 403 Main

---

[52] ULV 000015.
[53] ULV did offer a Credit/No Credit option during the Spring 2020 Semester.
[54] Spence, Michael "Job Market Signaling." *Quarterly Journal of Economics*. 87(3), 1992, pp. 355–374.
[55] Walsh, James D. "The Coming Disruption," *New York Magazine*, May 11, 2020.
[56] Correspondence from ULV Representative, Daniel Byrd, Ph.D., dated January 14, 2022 (Arredondo v. ULV – Retention Rate.pdf).
[57]  Arredondo Deposition, p. 167.

Campus ULV undergraduates were surveyed, and over 60% of these students reported no concerns with the transition to online classes.[58]

Ms. Arredondo did not propose any method to measure the associated individualized values putative class members received from any differential educational environments they experienced during the virtual portion of the Spring 2020 Semester.

Second, Ms. Arredondo has not demonstrated that there was any diminishment in teacher student interaction after Main Campus ULV transitioned to the virtual portion of the Spring 2020 Semester. While students still interacted with teachers and with their peers during Zoom classes, any diminishment in classroom interaction that might have occurred would be highly individualized as discussed in nationwide studies. For example, about half of the total course hours at universities across the country deliver are high volume courses like Sociology 101.[59] The classroom interaction in such classes likely could be less impacted by a move to virtual classes than specialized seminars.[60] Consequently, Main Campus ULV undergraduates who attended large lecture classes at the beginning of the Spring 2020 Semester might not have had much classroom interaction in the first place. On the other hand, some students in small seminars might opt not to participate in classroom discussions irrespective of teaching environment. Teacher student interactions can also differ by major. While the number of full time faculty members in majors like comparative literature and physics in general exceed the number of undergraduate degrees they annually award, other majors like psychology award 4 to 5 undergraduate degrees per faculty member.[61] Additionally, classroom discussion, which could vary by class and student makeup, greatly affects learning.[62]

Ms. Arredondo did not propose any common, formulaic method to measure any value diminishment from any alleged reduction in classroom interaction in such a variety of classes.

Third, as discussed in the prior subsection, course ratings stayed consistent on average during the Spring 2020 Semester.[63] However, there is variability around the course ratings. For example, the course ratings from Spring 2019 to Spring 2020 for the LaFetra College of Education and the College of Business and Public Management increased while ratings for courses in the College of Arts and Sciences fell.[64] There likely was intra-school variability as well. Ms. Arredondo did not address how her damages model would account for such individualized beliefs about the Spring 2020 Semester.

Fourth, Ms. Arredondo's proposed framework for her Proposed Per Capita Prorated Market Comparable Tuition Damages Theory ignores the individualized benefits putative class members

---

[58] ULV 005309–ULV 005310.

[59] Ruth, Stephen, Can MOOC's and Existing E-Learning Efficiency Paradigms Help Reduce College Costs? (June 18, 2012), p. 6.

[60] Faculty without Students: Resource Allocation in Higher Education. William R. Johnson and Sara Turner *Journal of Economic Perspectives*: 23(2), 2009, p. 177.

[61] Id., p. 172.

[62] Emanuel, Jeff and Lamb, Anne, "Open, Online, and Blended: Transactional Interactions with MOOC Content by Learners in Three Different Course Formats," working paper, 2015, p. 15-16 and author's personal teaching experience.

[63] Correspondence from ULV Representative, Daniel Byrd, Ph.D., dated January 13, 2022 (Main Campus Undergraduate Course Evaluations.pdf).

[64] Ibid.

might have received from virtual classes.  For example, one study showed that students obtained increased family time and additional free time to either get a job, sleep, exercise, pursue hobbies, personally or professionally develop and pursue other enjoyments of life.[65]  In addition, having the ability to go through lectures at your own pace is a benefit of online learning. This, again, further necessitates individualized inquiry amongst putative class members in order to calculate alleged damages.

### c.    *Individualized Net Prices*

Main Campus ULV's List Price for tuition and its List Price for fees for the Spring 2020 Semester was highly individualized.

While Main Campus ULV identified a flat rate List Price of $21,720 for tuition for a full-time undergraduate student during the Spring 2020 Semester, the List Price per credit hour would depend upon how many credit hours were taken. Ms. Arredondo provided no explanation of how to account for this individualized List Prices per credit hour in her Proposed Per Capita Prorated Market Comparable Tuition Damages Theory.

Main Campus ULV's List Prices for fees were highly individualized as well during the Spring 2020 Semester.  While full-time undergraduates are charged the ASULV and Student Health Insurance Fee, not all students were charged the various other fees shown on Exhibit 3.  Again, Ms. Arredondo provided no explanation of how to account for the individualized List Prices of the Fees charged to Main Campus ULV undergraduates in her Proposed Per Capita Prorated Market Comparable Tuition Damages Theory.

Not only do individualized issues arise with Main Campus ULV's List Prices, but further individualized issues arise with the net prices students actually pay.

The List Prices for tuition and fees are the amounts that Main Campus ULV states are being charged on its website and brochures.  However, only a small percentage of students nationwide pay these list prices as most students receive financial aid of some sort.  At Main Campus ULV, 98% of full-time, first-time undergraduate students received financial aid and did not pay full List Price for tuition.[66]   Consequently, Ms. Arredondo's Proposed Per Capita Prorated Market Comparable Tuition Damages Theory is based on information that **is only applicable to only 2% of full-time undergraduate students**, her theory is not applicable to the entire putative class.

Furthermore, economists have found the university List Prices, which the Plaintiff bases her Proposed Per Capita Prorated Market Comparable Tuition Damages Theory, to be "uninformative."  In particular,

> the school's listed tuition [and fees] – its "list price" – is often about as **(un-) informative** as the list price of a car.  Many students pay less than the list price, and hence any study using listed tuitions [and fees] as the price of education **will exaggerate** both the real cost to students and the school's tuition revenue….

---

[65] Patricia Aguilera-Hermida, A.. "College students' use and acceptance of emergency online learning due to COVID-19." International Journal of Educational Research Open vol. 1 (2020): 100011. doi:10.1016/j.ijedro.2020.100011.
[66] https://nces.ed.gov/ipeds/datacenter/InstitutionProfile.aspx?unitid=117140 viewed on January 11, 2022.

> With financial aid in the form of a tuition discount common, list price is frequently less meaningful than "net tuition" – the discounted price – not to mention other forms of student aid, including loans and work-study jobs.[67]

Because Ms. Arredondo's Proposed Per Capita Prorated Market Comparable Tuition Damages Theory is based upon uninformative and exaggerated list price data, its conclusions would likewise be uninformative and exaggerated.

Detailed calculations, which the Plaintiff ignores, are required to determine net prices the university receives and the net prices that students actually pay. For example, if the List Price for tuition and fees were $25,000 and Main Campus ULV granted a given student a $15,000 scholarship, the net price the university receives would be $10,000. If the student in question also received a $3,000 scholarship from their local Chamber of Commerce, the net price the student paid would be $7,000.

Because Main Campus ULV customizes the scholarships it grants on an individualized basis, "[t]he net tuition [and fees] paid by students sitting in the same college classroom is often quite different, varying by student characteristics such as ability, income, and minority status."[68] Economists have found that universities' increased pricing sophistication has caused "the net price of college … [to] become increasingly individualized."[69] For example, *Figure 4* below shows that the average net price Main Campus ULV receives varies by income level.[70]

| Figure 4 Average Net Price Main Campus ULV Receives by Income Level | | |
|---|---|---|
| **Income Level** | **2018-2019 Average Net Price Main Campus ULV Receives per Semester[71]** | **Average Net Price as a % of Cost of Attendance** |
| $0 - $30,000 | $10,649 | 35% |
| $30,001 - $48,000 | $11,714 | 38% |
| $48,001 - $75,000 | $12,302 | 40% |
| $75,001 - $110,000 | $13,955 | 45% |
| $110,001 and more | $17,306 | 56% |

---

[67] Weisbrod, Burton A., Jeffrey P. Ballou, and Evelyn D. Asch Mission and Money: Understanding the University Cambridge University Press, 2008 ("Weisbrod")., p. 78 & 80. (**emphasis** added).

[68] Epple, Dennis, David N. Figlio and Richard E. Romano (2004). "Competition Between Private and Public Schools: Testing Stratification and Pricing Predictions," *Journal of Public Economics*, 88(7-8), ("Epple"), p. 1.

[69] "Information Constraints and Financial Aid Policy" Judith Scott-Clayton, NBER Working Paper 17811, February 2012 (Scott-Clayton 2012), p. 2.

[70]   https://nces.ed.gov/collegenavigator/?q=university+of+la+verne&s=all&id=117140#expenses   viewed   on December 30, 2021.

[71] 2019-2020 academic year information by income level was not fully reported. I reserve the right to update this information for 2019-2020 if it becomes available. Average net price is generated by subtracting the average amount of federal, state/local government, or institutional grant or scholarship aid from the total cost of attendance. Total cost of attendance is the sum of published tuition and required fees, books and supplies, and the weighted average for room and board and other expenses.

The amount of financial aid Main Campus ULV offers a given student could be different than the aid another school might provide as "[d]ifferent schools may offer the same student different amounts of aid."[72]

As a result, individualized analyses would be required to determine the relevant tuition and fees at both Main Campus ULV and the "comparable" university needed to calculate damages.  As discussed above, La Verne Online does not offer institutional financial aid.

## B.      The Plaintiff's Prorated Methodology Is Fatally Flawed

Even if some prorated methodology were viable, it is economically incorrect to assume that the putative class members' diminished value would be proportional to the number of days of the virtual class portion of the Spring 2020 Semester.

Such an assumption implies that that each day in the Semester was equally valuable to each student.  While such an assumption might be convenient, it is not economically correct.  Not only does each student's marginal utility differ between putative class members, but the number of days students are on campus also varies on an individualized basis.

### 1.      Marginal Utility Is Different For Each Student

One standard economic maxim is that people generally obtain decreasing marginal utility for consuming products.[73]  In other words, the additional benefits one receives from consuming an additional unit of a product decreases as one consumes more.  For example, a person generally gets greater benefits from consuming the first slice of pizza than the tenth slice.

Ms. Arredondo's proposed prorated methodology does not consider whether students received greater benefits from in-person classes during the first part of the Spring 2020 Semester than they would have in the second part if Main Campus ULV had not moved to all virtual classes.  There are an enumerable number of individualized reasons why such an economic phenomenon could occur.  For example, graduating seniors who had secured early employment or graduate school admission might view the second part of the Spring 2020 Semester differently than other students.

Consequently, the degree to which putative class members experienced decreasing marginal utility during the Spring 2020 Semester would be individualized.  Consequently, Ms. Arredondo cannot value putative class members' alleged losses with her pro-rata assumption.

### 2.      The Number of Relevant Days Is Individualized

Even if each day in the Spring 2020 Semester were equally valuable to all putative class members, the number of relevant days is highly individualized.  Ms. Arredondo suggests that her prorated percentage could be calculated by taking the number of days that Main Campus ULV only offered virtual classes divided by the total number of relevant days in the Spring 2020 Semester.  However,

---

[72] Dynarski, Susan and Judith Scott-Clayton "Financial Aid Policy: Lessons From Research" NBER Working Paper, 2013 ("Dynarski"), p. 14.
[73] https://www.investopedia.com/terms/l/lawofdiminishingutility.asp viewed on September 28, 2021.

individualized analyses would be required to determine both the numerator and denominator of this proportion.

For example, the Spring 2020 Semester could have begun on January 3 if a student was enrolled in the "January Interterm 2020" or February 3 if they were only enrolled in "Spring 2020." Thus, the number of relevant days would vary depending on a student's start date in the Spring 2020 Semester. On the other hand, the Spring 2020 was scheduled to end on May 31, 2020 with Commencement; however, finals week would have been prior to that date.[74] Students whose finals ended early during the Spring 2020 Semester might leave campus early. Thus, the number of relevant semester days would be lower for such early leavers as compared to students whose finals ended later.

Additionally, the number of relevant days and the value of those days would vary by numerous factors including, but not limited to:

- Days where students did not have any classes;
- Students who had more classes on a given day;
- Students who went home for some or all weekends; and
- Students who infrequently attended professor office hours.

For example, if only instructional days were considered and students had classes on every one of those days including "January Interterm 2020," only 50% of the Spring 2020 Semester would remain compared to the 64% that Ms. Arredondo claims.[75]

The aforementioned logistical issues make the claimed formulaic calculation of damages highly individualized. Consequently, contrary to Ms. Arredondo's unsupported assumption, any decreased price Main Campus ULV might charge for the tuition and fees would be highly individualized and not necessarily tied to the number of days as alleged.

# VIII.   The   Plaintiff's   Proposed   Prorated   Market Comparable Fee Damages Theory Is Fatally Flawed

Ms. Arredondo did not specify if she would utilize a prorated and/or a market comparable approach to calculate her alleged fee damages. It is possible that she could claim that students received no value from the services associated with the Fees at issue in this lawsuit. In other words, she could claim that students should receive a refund equal to the List Price of the Spring 2020 Semester Fees multiplied by the portion of that Semester that had virtual classes.

Contrary to such a damages theory, Main Campus ULV undergraduates did **NOT** receive **ZERO** value from the services associated with the Fees at issue in this lawsuit after Main Campus ULV moved to the virtual portion of the Spring 2020 Semester. As discussed in subsection A below, students received often greater value from the associated services during this time. Individualized

[74] 2019-2020 Catalog.pdf, p. 5 (ULV 000038).
[75] Instructional days excludes weekends and holidays. 50% is calculated by starting the Spring 2020 Semester with the January 3, 2020 Interterm start date, considering March 23, 2020 as the transition date to online, and ending on May 31, 2020.

analyses would be required to demonstrate that a given student received reduced value and, if so, what that value was.

In fact, the Plaintiffs acknowledge that Main Campus ULV undergraduates received some services and, thus, some value during this time, but they claim that the services were "limited."[76]  Even if the services were "limited" in some way, the Plaintiffs do not provide a common formulaic methodology to assess the value of the "limited" services they acknowledge students at least received.  Nor did the Plaintiffs assess the value of the "added" services that students received during the Spring 2020 Semester.

Even if the Plaintiffs could somehow show that they could calculate a value diminishment during a portion of the Spring 2020 Semester in a uniform, class-wide basis, subsection B shows that such a diminishment would not necessarily be proportional to the number of days after Main Campus ULV allegedly closed or reduced its services.  If such a calculation needed to be performed, the relevant number of days would be highly individualized.

## A.   Students Received Value from the Portion of the Spring 2020 Semester After Main Campus ULV Allegedly Closed or Reduced Its Services

Main Campus ULV undergraduates arguably received similar value from the services associated with the allegedly relevant "Mandatory Fees" after the transition to virtual classes.  If a student experienced a value diminishment in any way, an individualized analysis on a student-by-student basis would be required to determine the value that that student received.  Even if some services were reduced or different in some way, individualized analyses would be required to assess the added / different services students received.

### 1.   Contemporaneous Data Show That Putative Class Members Received Value from the Portion of the Spring 2020 Semester After Main Campus ULV Transitioned to Virtual Classes

For each of the Fees that the Plaintiff claims should be refunded, Main Campus ULV provided the associated services after the transition to virtual classes.

#### a.   ASULV Fee

Ms. Arredondo performed no analysis of the ASULV Fee to demonstrate that students lost any associated services.  In particular, Ms. Arredondo just asserted that the putative class members lost value associated with the ASULV Fee because students did not have access to "La Verne's health and wellness facilities, programs or services; fitness facilities; student events or sports; and an in-person commencement."[77]

This assumption is flawed along multiple dimensions.

---

[76] Memorandum Of Points And Authorities In Support Of Plaintiff's Motion For Class Certification, p. 24-25.
[77] Second Amended Class Action Complaint, paragraph 45.

Ms. Arredondo has not demonstrated that any damage remains regarding the ASULV Fee. As noted above, Main Campus ULV has already refunded 62.5% of the ASULV Fee based upon its calculation of the virtual class portion of the Spring 2020 Semester. Ms. Arredondo has not demonstrated that Main Campus ULV made any errors in this percentage calculation. As a result, she cannot claim that students have not already been made whole regarding this Fee. Furthermore, she has not disavowed the possibility that her damages theory implies that students should receive an additional discount on top of the discount that students have already received.

Furthermore, I contend that students were made **more than** whole by the 62.5% ASULV Fee refund that has already occurred because Ms. Arredondo misidentified the relevant services and students continued to receive value from the relevant services after Main Campus ULV transitioned to virtual classes.

Most of the services Ms. Arredondo identified that she claims are associated with the ASULV Fee are not. For example, as discussed in Section III.A.2, the ASULV Fee does not provide funding for "La Verne's health and wellness facilities, programs or services; fitness facilities; student sports; and an in-person commencement" as the Plaintiff alleges. As a result, Ms. Arredondo is claiming ASULV Fee losses because students allegedly experienced losses in unrelated services.

While the ASULV Fee does fund some student events, these events continued after the transition to virtual classes. For example, the services associated with the ASULV Fee were mostly still accessible and provided virtually after March 16, 2020.[78] The Campus Activities Board hosted virtual events via Instagram and Zoom.[79] While these services and events might have had different characteristics than the services and events prior to the transition to virtual classes, individualized analyses would be required to determine if these differences resulted in lesser value to each individual student.

Even if a given student experienced some reduction in value for one of the services at issue, Ms. Arredondo's damages theory has not determined whether there were any offsetting value augmentations. For example, some of the funds associated with the ASULV Fee were reallocated to the University Emergency Fund during the Spring 2020 Semester.[80] This Emergency Fund distributed money directly to students in need. For example, Ms. Arredondo received a $250 ULV Emergency Fund Award during the Spring 2020 Semester.[81] Additionally, part of the ASULV Fee went to purchasing wifi hotspots for students to assist with their virtual classes.[82]

In order to properly assess damages in this matter, one must deduct these offsets from any reduced value an individual student might have received from services associated with the ASULV Fee. For example, the direct benefit Ms. Arredondo received from one aspect of the ASULV Fee, the $250 ULV Emergency Fund Award, exceeds the List Price of the ASULV Fee ($160), the List Price of the ASULV Fee less the prior $100 refund as well as the net price of the ASULV Fee that students actually paid, which would be less and individualized.

---

[78] Correspondence from ULV Chief Student Affairs Officer, Juan Regalado, dated January 12, 2022 (ASULV Fee Additional Info.pdf).
[79] ASULV fee additional documentation.docx.
[80] ASULV fee additional documentation.docx.
[81] ULV 002518.
[82] ASULV fee additional documentation.docx.

### b.    Student Health Insurance Fee

Ms. Arredondo performed no analysis of the Student Health Insurance Fee either to demonstrate that the fee pertains to the services that were allegedly lost.  As mentioned in Section III.A.3, the Student Health Insurance Fee enrolls students in the USMI Plan, which provides students with free healthcare at Main Campus ULV's Student Health Center.

Therefore, the Student Health Insurance Fee provides specific health insurance as opposed to the alleged general access to health and wellness facilities.  Consequently, Ms. Arredondo damages theory again does not properly measure any alleged student losses due to paying the Student Health Insurance Fee in Spring 2020.

Even if Ms. Arredondo's damages theory linked the Student Health Insurance Fee to specific allegedly lost services, her damages theory is still improper because putative class members still received value after March 16, 2020.

First, Ms. Arredondo's allegations that students received no benefit from the Student Health Insurance Fee after classes went virtual are false because Main Campus ULV's Student Health Center remained open on-site after March 16, 2020 to see students by appointment.[83]

Second, Main Campus ULV's Student Health Center also provided additional telehealth services to students after March 16, 2020.[84]  Additionally, Student Health Services provided referrals to students for health services in their local area if they relocated from La Verne.[85]

Third, Main Campus ULV's pharmacy still provided prescriptions to some students after March 16, 2020.[86]

Therefore, Main Campus ULV undergraduates still had access to and received Main Campus ULV's Student Health Services after Main Campus ULV transitioned to virtual classes.

While these services might have had different characteristics than the services provided prior to the transition to virtual classes, Ms. Arredondo has not shown that they are of lesser value.  Even if an individual student found one of the services to be of lesser value, individualized analyses would be required to determine that value.

### c.    Various Other Fees

As discussed above, Ms. Arredondo also claimed that students were overcharged for other "Mandatory Fees."

However, many of these other Fees that are displayed in Exhibit 3 relate to one-time events whose associated services students immediately received.  For example, if a student paid a fee to receive a transcript, that transcript is not of lesser value because Main Campus ULV held virtual classes.  Furthermore, Ms. Arredondo received the same full benefit from the two "other" fees she was assessed even though Main Campus ULV held virtual classes.  For example, Ms. Arredondo was

---

[83] ULV 005360-ULV 005361 & Arredondo Fee Report 2.xlsx.
[84] Arredondo Fee Report 2.xlsx.
[85] ULV 005360-ULV 005361 & Arredondo Fee Report 2.xlsx.
[86] Correspondence from Marlynn Howe, per ULV, dated January 10, 2022 (Arredondo v. ULV - Health Fee.pdf).

assessed a Graduation Fee.[87]  However, she was offered even more value than students in prior years from that Graduation Fee as she graduated from Main Campus ULV in January 2021 and was offered additional virtual ceremonies, a virtual graduation, and a graduation gift on top of an in-person graduation held later in the summer of 2021, whereas prior graduates were only offered one in-person graduation with no gift for their Graduation Fee.[88]  Ms. Arredondo did not attend any of her graduations.[89]  Ms. Arredondo was also assessed a Deferment Fee, which Main Campus ULV assessed to allow her to pay her tuition and fees on an installment basis.[90]  She received value from that Deferment Fee as she still received the benefit of paying her tuition and fees on an installment plan.

Students were also assessed specific course fees.  An individualized inquiry on a student-by-student basis would be required to assess if a Main Campus ULV student took the course, was charged the fee, if the service that the fee funds was received, and if there was any lost service, the extent to which it was lost.  For example, students were assessed a fee for the photography laboratory and a music technology class.  Individualized analyses would be required to determine if students still had access to the requisite technology after the transition to virtual classes and the extent that that technology was utilized.

## 2. *Even If There Were Some Diminishment in Value During the Time Main Campus ULV Allegedly Closed or Reduced Its Services, That Supposed Diminishment Would Be Highly Individualized*

Even if certain services were denied, the Plaintiff claims that she could ignore individual student usage of such services because all students commonly paid for and were denied access to on-campus services and facilities.

Even though there was some denial of access to on-campus services and facilities, students would value that access differently depending upon their usage.  Nobel Prize-winning options theory states that the value of an option to access certain services depends upon the likelihood of that person utilizing the services.[91]  An option would be worthless to someone who would never exercise it.

Therefore, Main Campus ULV undergraduates who do not utilize on-campus services, such as certain student activities, at all were not damaged by their transition to virtual services.  The option to access these services would be worthless to such students. These students would have been in the same economic position even if the services had not transitioned.  The services' transition did not reduce these students' effective irrelevant access to the services.

---

[87] ULV 000007-ULV 000008.

[88] Correspondence from ULV Chief Student Affairs Officer, Juan Regalado, dated October 25, 2021 (Graduation Fee.pdf).

[89] Arredondo Deposition, p. 302-304.

[90] Martinez Declaration (p. 2)., "Deferment Fee" is associated with Plaintiff's execution and utilization of a payment plan, which allowed her to pay her tuition and fees on an installment basis.

[91] Black, Fischer, and Myron Scholes. "The Pricing of Options and Corporate Liabilities." *Journal of Political Economy*, vol. 81, no. 3, University of Chicago Press, 1973, pp. 637–54, http://www.jstor.org/stable/1831029.  On p. 638, it states "...if the price of the stock is much less than the exercise price, the option is almost sure to expire without being exercised, so its value will be near zero."

Even though students do not directly receive value from unutilized campus services, one educator found that "the majority of students agree that they should fund programs they may never utilize with student fees."[92]

Because students utilize the campus in different ways, any losses they might have suffered because they were allegedly denied access to certain on-campus services would also be different. Utilizing options-pricing terminology, because the likelihood a given student would utilize a given service as well as the value that student would receive if it were utilized varies from student-to-student, so would the value of access to those services if utilized. Therefore, any alleged diminishment in campus use also would be highly individualized.

Individualized analyses would be required to determine the likelihood of a given student utilizing certain services. For example, studies have even shown that certain demographics (e.g., commuter students) tend to not utilize certain on-campus services, like certain student clubs.[93] Also, some students may attend club events weekly; others might have different social outlets including going to their primary residence on weekends. Freshman might utilize the clubs in different ways than upperclassmen. Additionally, studies have shown that students who pay fees themselves (as opposed to parents or other third-parties) are more likely to utilize the services associated with those fees.[94]

Furthermore, Ms. Arredondo was not damaged because of the alleged denial of access because she did not utilize many of the services associated with the allegedly relevant fees. For example, when Ms. Arredondo was asked what activities she participated in while she was an on-campus Main Campus ULV student, Ms. Arredondo replied saying nothing came to mind.[95]

Even if Main Campus ULV did deny students access to some services, it is questionable if students would have accessed those services but-for Main Campus ULV's actions. For example, during the Spring 2020 Semester, many Main Campus ULV undergraduates voluntarily opted not to congregate with other people for fear of catching COVID-19. Such students likely would not have utilized the in-person student activities even if they occurred. As a result, Main Campus ULV's actions did not harm such COVID-careful students.

Consequently, if access was a proper means to assess damages as the Plaintiffs allege, the different ways students utilize campus services and the value they receive from their use, especially amidst COVID-19, would cause damages to be highly individualized.

---

[92] Sterritt, Adam Burke "State Governance, Politics, and Mandatory Student Fees: Navigating a New Reality in the University System of Georgia." Doctoral Dissertation, University of Georgia, 2011, ("Sterritt"), p. 20.
[93] Newbold, John J., Sanjay S. Mehta and Patricia Forbus "Commuter Students: Involvement and Identification with an Institution of Higher Education", *Academy of Educational Leadership Journal*, Vol 15, 2011, ("Newbold"), p. 142.
[94] For example, see a discussion of how payment methodology could affect consumption in Gourville, John T. and Dilip Soman "Pricing and the Psychology of Consumption" *Harvard Business Review*, September 2002. https://hbr.org/2002/09/pricing-and-the-psychology-of-consumption viewed on January 17, 2021.
[95] Arredondo Deposition, p. 260.

## B.     The Number of Days Cannot Be Utilized to Calculate Prorated Damages

Even if some prorated methodology were viable, it is economically incorrect to assume that the putative class members' diminished value would be proportional to the number of days of the virtual class portion of the Spring 2020 Semester.

As discussed above in Section VII.B., such an assumption implies that each day in the Semester was equally valuable to each student.  While such an assumption might be convenient, it is not economically correct.  Not only does each student's marginal utility differ between putative class members, but the number of days students are on campus also varies on an individualized basis.

Section VII.B.1 shows that each student's marginal utility is different for tuition.  This also holds for the services associated with the fees allegedly at issue in this matter.  It is very possible that students received greater benefits from access to campus services during the first part of the Spring 2020 Semester than they would have in the second part if Main Campus ULV had not closed campus or moved to virtual services.  For example, students with a New Year's Resolution may be motivated to use the gym at the beginning of the semester, but lose motivation and no longer go to the gym by mid-March, when the gym physically closed.  Students may also study more and utilize fewer services as finals approach.  Conversely, there could be some students who would work out more in the gym as a stress relief during finals.

Additionally, as discussed in Section VII.B.2, the number of relevant days to utilize in the Plaintiff's Proposed Per Capita Prorated Market Comparable Tuition Damages Theory is highly individualized.  The number of relevant days and the value of those days would vary by numerous factors including, but not limited to:

- Students who attended "January Interterm 2002;"
- Days where students did not have any on-campus activities;
- Students who had more on-campus activities on a given day; and
- Students who went home for some or all weekends.

The aforementioned logistical issues make the claimed formulaic calculation of damages highly individualized.  Consequently, contrary to Plaintiffs' unsupported assumption, any decreased price Main Campus ULV might charge for the fees would be highly individualized and not necessarily tied to the number of days as alleged.

# IX.   Even if Ms. Arredondo Were Able to Demonstrate that Main Campus ULV's Spring 2020 Semester Was Less Valuable in Some Way, Putative Class Members Were Not Necessarily Damaged

Notwithstanding the aforementioned, even if Ms. Arredondo was able to demonstrate students received less value because of the transition to virtual classes, they might not have been damaged for multiple reasons.

## A.    *Students Receiving Financial Aid Might Not Be Damaged*

University officers dispensing Federal and institutional need-based financial aid at least partially base their aid recommendations on the school's Cost of Attendance and the student's Expected Family Contribution.[96]

Financial aid officers regularly address situations where a student's Cost of Attendance or Expected Family Contribution changes during a term.  In such an instance, Main Campus ULV's Office of Financial Aid could reduce the grants or scholarships it awarded.[97]

In this lawsuit, students are seeking a refund of tuition and alleged Mandatory Fees.  If such a refund were to occur, every student's Cost of Attendance could change.  As a result, Main Campus ULV's Office of Financial Aid could recalculate its institutional grants and scholarships and ULV loans it provided to all students.  For example, suppose that Main Campus ULV's list price for tuition and fees were $25,000, and that Main Campus ULV's Office of Financial Aid determined that a given student's family should only contribute $10,000 toward the student's education in that year.  In this situation, Main Campus ULV could provide this student with a $15,000 scholarship.

Assuming that the Finder of Fact in this lawsuit determines that the combined list price for Main Campus ULV's tuition should have been $1 lower.  This would cause the total list price for tuition and fees to fall to $24,999.  The Office of Financial Aid **might** still determine that the given student's family should only contribute $10,000.  In this revised situation, Main Campus ULV would provide this student with a $14,999 scholarship.

In this example, the student would not be damaged by the supposed tuition and fee overcharge.  The student actually paid $10,000 and would have paid $10,000 if the tuition and fees were "properly" priced.  Therefore, this student incurred no out-of-pocket losses from Main Campus ULV's alleged actions.

Even if Main Campus ULV did not adjust this student's scholarship amount, they likely could not claim damages as they paid $10,000 to receive something that had $24,999 in value.

Additionally, COVID-19 could further affect the student's available finances.  While some families could have been adversely affected by COVID-19, others saw their financial positions greatly improved during the Spring 2020 Semester.  As a result, students' Expected Family

---

[96] The Cost of Attendance is the amount it will cost a student to attend a university.  The COA includes an estimate of tuition and fees; the cost of room and board (or living expenses for students who do not contract with the school for room and board); the cost of books, supplies, transportation, loan fees, and miscellaneous expenses (including a reasonable amount for the documented cost of a personal computer); an allowance for child care or other dependent care; costs related to a disability; and/or reasonable costs for eligible study-abroad programs.

The Expected Family Contribution is determined from the Federal government's Free Application for Federal Student Aid ("FAFSA") form.  Students provide detailed family financial information as well as information about the schools students are considering attending on the FAFSA form.  ULV's Office of Financial Aid utilizes the information reported on the FAFSA form to calculate the EFC, which is how much money a student's family could contribute if the student were to attend ULV.  The formula includes information on the student's/family's taxed and untaxed income, assets, and benefits (such as unemployment or Social Security), as well as demographic characteristics such as the student's family size and the number of family members who will attend college during the year.  See https://studentaid.gov/complete-aid-process/how-calculated viewed on January 17, 2022.
[97] ULV vs Arredondo.docx.

Contribution could also change, which could add additional individualized potential modifications to the financial aid Main Campus ULV provides its students. For example, as discussed below, many students received COVID-relief funds from the university during the Spring 2020 Semester.

Therefore, if it is determined that Main Campus ULV's tuition and fees should have been lower, at a minimum, Main Campus ULV's Office of Financial Aid could have to recalculate all the aid it provided students. To determine the amount that students were damaged by Main Campus ULV's allegedly improper tuition and fees, one would have to, at a minimum, calculate the supposed tuition overcharge and subtract out any financial aid changes caused by Cost of Attendance and other COVID-related changes.

Because the aid the Office of Financial Aid provides is highly individualized, any aid recalculation also would be highly individualized. Consequently, properly determining any economic loss students might have suffered because of any alleged tuition and fee overcharge would also be highly individualized. As a result, I do not know how any economically proper refunds of these net prices could be calculated on a uniform formulaic, class-wide basis.

Essentially, the Plaintiff is claiming that had she, and all other Main Campus ULV undergraduates, known that COVID were going to occur during the Spring 2020 Semester, they would have paid less for tuition than they actually did.

However, with such a claim, one must fully analyze all of the economic effects on the students; one cannot isolate one's analysis to just tuition and alleged Mandatory Fees.

For example, Main Campus ULV distributed $2.82 million in COVID-relief payments made by Main Campus ULV to 2,916 students who applied for assistance during the pandemic.[98] Because these COVID-relief payments, like the alleged tuition and fee overcharges, would not have happened but-for COVID, any COVID-relief money students received would have to be subtracted from any damages award. As Plaintiffs have a duty to mitigate, the COVID-relief money that students would have received had they applied also needs to be subtracted from damages.

Because students could have received different COVID-relief payments, this damages adjustment would also be individualized.

## B.   *Students Who Did Not Pay Their Own Tuition Would Not Be Damaged, Which Further Creates Individualized Issues*

As mentioned above, plaintiffs are seeking to certify the following putative class:

> **All persons who paid** tuition and/or the Mandatory Fees at La Verne's Main/Central campus location during the Spring 2020 term/semester.[99]

Thus, students who did not pay their own tuition would not be damaged because they are not included in the putative class. This definition recognizes that only the person who actually paid tuition and fees could have potentially suffered economic injury. Those who paid tuition and fees

---

[98] ULV 002502.

[99] Memorandum Of Points And Authorities In Support Of Plaintiff's Motion For Class Certification, p. 2 (**emphasis** added).

would not only be students, but also family members or other benefactors who paid the students' tuition and fees. This further creates individualized issues amongst the putative class.

First, since the class is defined to include people who paid tuition, it would be necessary to identify each individual student's source of funds. I know of no unified source that contains such information as Main Campus ULV does not record such information.

Second, there are additional individualized issues between family members paying for tuition as opposed to students. For example, parent payers could have different views about alleged overcharges than student payers. Wealthier parents could be less price sensitive than student payers who are just starting their careers. Wealth effects are demonstrated by the recent college admissions scandal where people paid millions for college admittance.[100] These dichotomies cause payers to react differently to changing environments such as a switch to remote learning.

Third, by giving financial aid to its students, Main Campus ULV effectively paid "tuition and/or the Mandatory Fees" for students. As a result, Main Campus ULV should receive at least a portion of any alleged refund awarded to students who received financial aid. As discussed above, the calculation of the magnitude of this portion would be highly individualized.

Consequently, individualized analyses would be required to determine any resulting losses putative class members might have suffered due to the campus closures in Spring 2020.

## C.    Past Refunds Would Offset Any Alleged Damages

In addition to COVID-related aid, there were eight students who had a total of $36,467 of tuition refunded because of COVID-19.[101] These students had varying tuition refunded because of their individual circumstances, such as medical anxiety, job losses and conversely increased job workloads because of being essential workers during COVID-19.[102]

Thus, if the student was already refunded, then these refunds would need to be individually deducted from any alleged damages from the putative class. Ms. Arredondo has proposed no procedure to apply these individualized refunds in any damages calculation.

## D.    The Named Plaintiff, Ms. Arredondo, Was Not Damaged Because She Received Financial Aid and COVID-19 Grants

*Figure 5* below displays Ms. Arredondo's tuition, fees and financial aid for the Spring 2020 Semester.

---

[100] For example, see www.nytimes.com/2019/03/12/us/college-admissions-cheating-scandal.html viewed June 17, 2021.
[101] ULV 005190.
[102] Ibid.

| Figure 5 Spring 2020 Semester Tuition, Fees and Financial Aid for Ms. Arredondo[103] | |
|---|---|
| **Description** | **Amount** |
| Tuition (20 credit hours) | $21,720 |
| **Fees** | |
| ASULV Fee | $160 |
| Student Health Insurance Fee | $395 |
| Other Various Fees | |
|    Deferment Fee – Semester[104] | $50 |
|    Graduation Fee | $140 |
| **Subtotal – Fees** | **$745** |
| **Total – Tuition & Fees** | **$22,465** |
| **Financial Aid** | |
| ULV Grant | $5,800 |
| ULV Scholarship | $6,500 |
| Federal Pell Grant | $2,972 |
| **Subtotal – Financial Aid** | **$15,272** |
| **COVID-Related Aid** | |
| CARES Act Fund for Students[105] | $740 |
| ULV Emergency Fund Award / COVID-Related Aid | $250 |
| ASULV Fee Refund | $100 |
| **Subtotal – COVID-Related Aid** | **$1,090** |
| **Subtotal – Financial & COVID-Related Aid** | **$16,362** |
| **Net Price (Tuition & Fees less Financial Aid)** | **$6,103** |

There are several things to note about her financial statement.

First, Ms. Arredondo took 20 credit hours in Spring 2020, which is equivalent to a List Price Tuition of $1,086 per credit hour.  This is 27% less than what she is alleging the per credit hour tuition is at Main Campus ULV ($1,490) in her damages theory.  Therefore, Ms. Arredondo ignored the individualized value that Main Campus ULV undergraduates pay for tuition per credit hour.  In particular, she overstated the difference in the alleged value she would have received from Main Campus ULV and La Verne Online in her Proposed Per Capita Prorated Market Comparable Tuition Damages Theory for herself.

For example, the difference in tuition per credit hour for Ms. Arredondo between Main Campus ULV ($1,086) and La Verne Online ($645) would be $441 (40.6%) compared to Plaintiff's theory of $845 (=$1,490 - $645, or 56.7%).  After applying the alleged percentage of remaining days in the Spring 2020 Semester after Main Campus ULV transitioned to virtual learning (64%), the alleged damage per credit hour would be $282 or 26.0% for Ms. Arredondo compared to Plaintiff's

[103] Xochitl Martinez Declaration, Exhibit 1 (ULV 005189).
[104] Per Martinez Declaration (p. 2), "Deferment Fee" is associated with Plaintiff's execution and utilization of a payment plan, which allowed her to pay her tuition and fees on an installment basis.
[105] Xochitl Martinez Declaration, Exhibit 2 (ULV 002518).

theory of $541 or 36.3%.[106]  In terms of full tuition for Spring 2020, Ms. Arredondo's alleged List Price tuition damages would range from $5,647 (=$21,720 x 26.0%) to $7,884 (=$21,720 x 36.3%) depending on what percentage was used.  Therefore, Plaintiffs have not properly addressed the individualized nature of tuition per credit hour, which overstates Ms. Arredondo's alleged List Price tuition damages and many other similarly situated putative class members.

Second, Ms. Arredondo was assessed the ASULV and Student Health Insurance Fee, but only was assessed two of the other various fees.  As shown on Exhibit 3, there are 53 other various fees that a Main Campus ULV student could potentially be charged; therefore, it would be an individualized student-by-student analysis to verify what each student paid in fees.

Third, Ms. Arredondo received a substantial amount of financial aid to offset the List Price of her tuition and fees.  Financial aid grants/scholarships accounted for 68% of Ms. Arredondo's total payments to Main Campus ULV (=$15,272 / $22,465).  As a result, Ms. Arredondo has already received a 68% refund on her tuition and fees.  This refund exceeds the 36.3% refund she is seeking under her Proposed Per Capita Prorated Market Comparable Tuition Damages Theory.

Fourth, she received $1,090 of COVID-Related Aid from Main Campus ULV in the form of CARES Act aid, a Main Campus ULV Emergency Fund Award and the $100 ASULV Fee Refund.

These facts demonstrate that the Named Plaintiff was not damaged under the Plaintiffs' Proposed Per Capita Prorated Market Comparable Tuition Damages Theory.

Under the Plaintiffs' damages theory, Ms. Arredondo's Tuition and Fees should only have been $14,104 (= List Price Tuition & Fees $22,465 – Tuition Damages $7,884 – Fee Damages $477).[107]  However, Ms. Arredondo only paid $7,193 in Tuition and Fees (Total Tuition & Fees less her non-COVID Financial Aid).  Consequently, she received more in value for her Tuition and Fees than she paid.  Additionally, Main Campus ULV had the right to reduce her financial aid grants so that she still would have paid $7,193 in tuition and fees even if her List Price was reduced.  Furthermore, any losses that Ms. Arredondo might have suffered would have to be reduced by at least the $1,090 in COVID-Related Aid she received.

As a result, financial analyses under the Plaintiffs' Proposed Prorated Market Comparable Damages Theory demonstrate that Ms. Arredondo was not damaged.

---

[106] As mentioned above in Section VII.B.2, only 50% of the instructional days remained, which would result in even lower alleged damages.

[107] After correcting Plaintiffs' alleged Market Value Damages Theory, Ms. Arredondo's Tuition and Fees should have only been $16,341 (= List Price Tuition & Fees $22,465 – Corrected Tuition Damages $5,647 – Fee Damages $477).  Therefore, Ms. Arredondo allegedly would have received even greater value than Plaintiff's claim ($14,104).

# X. Ms. Arredondo's Damages Theory Does Not Demonstrate That Main Campus ULV Was Unjustly Enriched

It is my understanding that the Plaintiff has not addressed the issue of alleged unjust enrichment damages. I reserve the right to update my opinions if and when a complete unjust enrichment calculation is put forward as damages modeling is complex, making a complete identification of all required steps difficult without a baseline calculation.

Ms. Arredondo's damages theory only "addresses" the tuition and fees Main Campus ULV undergraduates paid. However, other items need to be analyzed in order to determine if Main Campus ULV was unjustly enriched. Any proper unjust enrichment analysis must, at least, analyze whether Main Campus ULV incurred significant costs and sacrificed revenue, which Main Campus ULV did. Like many universities, Main Campus ULV's transition to virtual classes caused it to forgo a large amount of income. For example, it incurred around a half million dollars in additional expenditures to update its classrooms, buildings and transportation to make them usable in a COVID-19 environment.[108] Main Campus ULV also lost millions of dollars in auxiliary revenue.[109] For example, Main Campus ULV refunded students money they paid for housing, room & board and other fees. Even though it did not earn revenue from these items during the campus closure, Main Campus ULV still incurred expenses relating to building costs, staffing and other items. Furthermore, Main Campus ULV did not receive revenue from sporting events, the bookstore, laundry machines, vending machines and other retail establishments during the campus closure. As discussed above, other analyses are likely required, which are difficult to identify without a baseline calculation.

As Ms. Arredondo does not contemplate such revenue and fees, her theory cannot be utilized to analyze Main Campus ULV's alleged unjust enrichment.

# XI. Conclusion

Ms. Arredondo's proposed damages methodology is flawed along multiple dimensions. First, it assumes that students would demand to pay less for virtual classes even though they actually exhibited contradictory behavior by paying similar amounts when confronted with a similar situation. Second, at best, her proposed damages methodology assesses alleged per capita losses for one type of putative class member, Main Campus ULV undergraduates, for tuition, but not fees. Not only does she not identify alleged per capita losses for other putative members, but she does not quantify the number of putative class members of each type. Third, her proposed damages methodology is further flawed because it assumes that all students would view La Verne Online as a comparable education environment, when Ms. Arredondo exhibited views to the contrary. Fourth, Ms. Arredondo's proposed damages methodology incorrectly assesses the fraction of the Spring 2020 Semester that is relevant to online learning. Not only does she improperly ignore the January portion of the Spring 2020 Semester, but she also overlooked other timing and valuation

---

[108] ULV 005201, ULV 005205 & ULV 005208.
[109] ULV 005192, ULV 005207 & ULV 002524.

issues.  Fifth, Ms. Arredondo ignored the values and services that ULV did provide when it offered virtual classes.  Sixth, even if Ms. Arredondo were able to demonstrate that Main Campus ULV's Spring 2020 Semester was less valuable in some way, putative class members were not necessarily damaged.


January 18, 2022

_____
Benjamin S. Wilner, Ph.D.

EXHIBIT D
49

**Brianna Arredondo v. University of La Verne**                                                    **Exhibit 1**
**Documents Considered**

| I. Legal Filings |
|---|
| Second Amended Class Action Complaint. |
| Defendant University of La Verne's Amended Supplemental Responses to Plaintiff's First Request for Production of Documents and Things. |
| Defendant University of La Verne's Opposition to Plaintiff's Motion for Class Certification. |
| Defendant University of La Verne's Response to Plaintiff's First Request for Production of Documents and Things. |
| Defendant University of La Verne's Response to Plaintiff's First Set of Interrogatories. |
| Defendant University of La Verne's Second Supplemental Responses to Plaintiff's First Request for Production of Documents and Things. |
| Defendant University of La Verne's Supplemental Responses to Plaintiff's First Request for Production of Documents and Things. |
| Defendant University of La Verne's Supplemental Responses to Plaintiff's First Set of Interrogatories. |
| Defendant University of La Verne's Third Supplemental Response to Plaintiff's First Request for Production of Documents and Things. |
| Deposition of Brianna Arredondo ("Arredondo Deposition"). |
| Declaration of Xochitl Martinez. |
| Memorandum of Points and Authorities In Support of Plaintiff's Motion for Class Certification. |
| Plaintiff's Motion for Class Certification & Exhibits. |
| Plaintiff's Initial Disclosures. |

| II. Documents Received from Counsel |
|---|
| Arredondo Fee Report 2.xlsx. |
| ASULV fee additional documentation.docx. |
| Correspondence from Marlynn Howe, per ULV, dated January 10, 2022 (Arredondo v. ULV - Health Fee.pdf). |
| Correspondence from ULV Chief Student Affairs Officer, Juan Regalado, dated October 25, 2021 (Graduation Fee.pdf). |
| Correspondence from ULV Chief Student Affairs Officer, Juan Regalado, dated January 12, 2022 (ASULV Fee Additional Info.pdf). |
| Correspondence from ULV Representative, Daniel Byrd, Ph.D., dated January 13, 2022 (Main Campus Undergraduate Course Evaluations.pdf). |
| Correspondence from ULV Representative, Daniel Byrd, Ph.D., dated January 13, 2022 (Traditional Undergraduate GPAs.pdf). |
| Correspondence from ULV Representative, Daniel Byrd, Ph.D., dated January 14, 2022 (Arredondo v. ULV – Retention Rate.pdf). |
| Correspondence from ULV Representative, Xochitl Martinez, dated January 17, 2022 (Full-Time Online Students). |
| Correspondence from ULV Representative, Xochitl Martinez, dated January 17, 2022 (ULV Online vs. ULV Main Campus Classes.pdf). |
| Correspondence from ULV Representative, Xochitl Martinez, dated January 17, 2022 (La Verne Online Grants.pdf). |
| ULV 000007 - ULV 000011 |
| ULV 000015 - ULV 000018 |
| ULV 000020 - ULV 000023 |
| ULV 000034 - ULV 000922 |
| ULV 002500 - ULV 002510 |
| ULV 002518 - ULV 002542 |
| ULV 005188 - ULV 005361 |
| ULV vs Arredondo.docx. |

**Brianna Arredondo v. University of La Verne**
**Documents Considered**

**Exhibit 1**

| III. Texts |
| --- |
| "Information Constraints and Financial Aid Policy" Judith Scott-Clayton, NBER Working Paper 17811, February 2012 (Scott-Clayton 2012). |
| Black, Fischer, and Myron Scholes. "The Pricing of Options and Corporate Liabilities." *Journal of Political Economy*, vol. 81, no. 3, University of Chicago Press, 1973, http://www.jstor.org/stable/1831029. |
| Dynarski, Susan and Judith Scott-Clayton "Financial Aid Policy: Lessons From Research" NBER Working Paper, 2013 ("Dynarski"). |
| Emanuel, Jeff and Lamb, Anne, "Open, Online, and Blended: Transactional Interactions with MOOC Content by Learners in Three Different Course Formats," working paper, 2015. |
| Epple, Dennis, David N. Figlio and Richard E. Romano (2004). "Competition Between Private and Public Schools: Testing Stratification and Pricing Predictions," *Journal of Public Economics*, 88(7-8), ("Epple"). |
| Faculty without Students: Resource Allocation in Higher Education.  William R. Johnson and Sara Turner *Journal of Economic Perspectives*: 23(2), 2009. |
| Gourville, John T. and Dilip Soman "Pricing and the Psychology of Consumption" *Harvard Business Review*, September 2002. https://hbr.org/2002/09/pricing-and-the-psychology-of-consumption viewed on June 17, 2021. |
| Newbold, John J., Sanjay S. Mehta and Patricia Forbus "Commuter Students: Involvement and Identification with an Institution of Higher Education", *Academy of Educational Leadership Journal*, Vol 15, 2011, ("Newbold"). |
| Patricia Aguilera-Hermida, A.. "College students' use and acceptance of emergency online learning due to COVID-19." International Journal of Educational Research Open vol. 1 (2020): 100011. doi:10.1016/j.ijedro.2020.100011. |
| Pollack, R., Bouchner, S., Enos, C., Johns, C. & Moyl, J. Calculating Lost Profits.  *AICPA Business Valuation and Forensic & Litigation Services Section Practice Aid* 06-4 (2013). |
| Ruth, Stephen, Can MOOC's and Existing E-Learning Efficiency Paradigms Help Reduce College Costs? (June 18, 2012). |
| Spence, Michael "Job Market Signaling." *Quarterly Journal of Economics*. 87(3), 1992. |
| Sterritt, Adam Burke "State Governance, Politics, and Mandatory Student Fees: Navigating a New Reality in the University System of Georgia." Doctoral Dissertation, University of Georgia, 2011, ("Sterritt"). |
| Walsh, James D. "The Coming Disruption," *New York Magazine*, May 11, 2020. |
| Weisbrod, Burton A., Jeffrey P. Ballou, and Evelyn D. Asch *Mission and Money: Understanding the University* Cambridge University Press, 2008 ("Weisbrod"). |

| IV. Other Documents Considered |
| --- |
| https://scholar.google.com/scholar?hl=en&as_sdt=0%2C14&q=benjamin+wilner&btnG= viewed on December 23, 2021. |
| https://collegestats.org/articles/beware-the-top-5-reasons-for-dropping-out-of-college/ viewed on August 9, 2021. |
| https://laverne.edu/health/ viewed on December 23, 2021. |
| https://laverne.edu/health/2020/all-university-of-la-verne-classes-to-move-online/ viewed on January 5, 2022. |
| https://laverne.edu/health/2020/an-update-from-president-lieberman-2/ viewed on January 5, 2022. |
| https://laverne.edu/health/2020/la-verne-safe-return-update-2/ viewed on January 10, 2022. |
| https://laverne.edu/health/2020/memo-to-resident-students/ viewed on January 5, 2022. |
| https://laverne.edu/health/2020/urgent-novel-coronavirus-update/ viewed on January 5, 2022. |
| https://laverne.edu/online/state-authorization/ viewed on January 5, 2022. |
| https://laverne.edu/programs/ viewed on January 10, 2022. |
| https://laverne.edu/student-life/asulv/student-activity-fee/ viewed on December 21, 2021. |
| https://nces.ed.gov/collegenavigator/?q=university+of+la+verne&s=all&id=117140#expenses viewed on December 30, 2021. |
| https://nces.ed.gov/ipeds/datacenter/InstitutionProfile.aspx?unitid=117140 viewed on January 11, 2022. |
| https://studentaid.gov/complete-aid-process/how-calculated viewed on January 17, 2022. |
| https://www.investopedia.com/ask/answers/042415/what-are-different-types-price-discrimination-and-how-are-they-used.asp viewed on January 13, 2022. |
| https://www.investopedia.com/terms/l/lawofdiminishingutility.asp viewed on September 28, 2021. |
| www.nytimes.com/2019/03/12/us/college-admissions-cheating-scandal.html viewed June 17, 2021. |

**Exhibit 2**



Alvarez & Marsal
Disputes and Investigations, LLC
540 West Madison Street – Suite 1800
Chicago, IL 60661
Phone: +1 312 601 4220
Fax: +1 312 332 4599

**Benjamin S. Wilner, Ph.D.**

Managing Director – Disputes and Investigations

bwilner@alvarezandmarsal.com

540 West Madison St.
Suite 1800
Chicago, IL 60661
Tel: (312) 470-8450

**Education**
Kellogg Graduate School
of Management,
Northwestern University
Ph.D.
Managerial Economics
and Decision Science

University of
Pennsylvania
BA magna cum laude
with distinction in major
Economics &
Mathematics

London School of
Economics
General Course Degree
Mathematics & Statistics

Dr. Benjamin Wilner has more than twenty years of advisory, valuation, and general economic & financial services experience as a consultant, academic & testifier. He is a Ph.D. economist and statistician who regularly serves as a consultant and testifying expert witness on financial damages, economic & statistical issues.

Dr. Wilner's disputes experience encompasses many industries and a broad range of single plaintiff, class action and criminal disputes including antitrust liability & damages, business interruption, business valuations, economic analyses, intellectual property, labor, lost income, product liability, statistical data analyses, and other corporate and litigation related matters.

In his consulting practice, Dr. Wilner advises corporations and governments on economic and statistical issues. For example, in addition to redesigning statistical aspects of an automobile manufacturer's warranty process, Dr. Wilner received a special commendation from the Commissioner of US Customs & Border Protection for building an economic model to restructure a $2.5 billion tariff, which has won praise by a Cabinet member, Congressional officials, and the industry.

Prior to joining Alvarez & Marsal, Dr. Wilner worked at other multinational consulting firms. He also has been a professor in the business schools at the University of Michigan, University of Iowa, Northwestern University, and the Helsinki School of Economics. Dr. Wilner was a research assistant for a Nobel Prize–winning economist and studied under two other Nobel Laureates. His work has been published in leading academic journals and textbooks as well as regularly cited in the academic and popular press. Dr. Wilner won several awards for teaching and research including a grant from the National Science Foundation.

**Benjamin S. Wilner, Ph.D.**
**Page 2**

**Testimony before a Trier of Fact**

- Employment Hearing Testimony in Scott Coren v. Ronald Pieri, Board of Fire and Police Commissioners, Highwood, Illinois, October 2019 & January 2020

- Sentencing Hearing Testimony in United States v. Mark Hazelwood, United States District Court, Eastern District of Tennessee, September 2018

- Arbitration Testimony in Topix Media Lab, LLC, v. Athlon Sports Communications, Inc., American Arbitration Association, November 2017

- Trial Testimony in Syngenta Crop Protection, LLC v. Willowood, LLC, Willowood USA, LLC, Willowood Azoxystrobin, LLC, and Willowood Limited, United States District Court, Middle District of North Carolina, September 2017

- Trial Testimony in Christine Ekalliipse Mouloki v. Marie Paule Epee and Eric Ngado Epee, United States District Court, Northern District of Illinois, Eastern Division, July 2017

- Trial Testimony in The People of the State of Illinois v. Ronald A. Pieri, State of Illinois, Circuit Court of Lake County, October 2015

- Trial Testimony in Sleepy's LLC, v. Select Comfort Wholesale Corporation, et al., United States District Court, Eastern District of New York, May – June 2012 & July 2015

- Trial Testimony in Grater, Inc., and James T. Zavacki v. Kevin T. Keating and Keating & Shure, Ltd., State of Illinois, Circuit Court of Cook County, March 2015

- Trial Testimony in Think Tank Software Development Corporation et al. v. Chester Inc., et al., State of Indiana, County of Porter, March 2014

- Trial Testimony in Sharon P. Clark, Commissioner of the Kentucky Department of Insurance, in her Capacity as Rehabilitator of AIK Comp v. TransAmerica Insurance Company and TIG Insurance Company, Commonwealth of Kentucky, Franklin Circuit Court, Division Two, October 2012

- Trial Testimony in Mario Vara v. Integra Properties, Inc., Abe Polatsek, S&M Corporation and Michael Strick, State of Illinois, Circuit Court of Cook County, July 2011

- Trial Testimony in Indeck Power Equipment Company v. Professional Power Products, et al., State of Illinois, Circuit Court of Cook County, April 2010



- Trial Testimony in Saint-Gobain Autover USA, Inc., et al. v. Xinyi Glass North America, Inc., et al., United States District Court, Northern District of Ohio, Eastern Division, November 2009
- Trial Testimony in NSM Music Group, Ltd. and NSM Music, Inc. v. Synergy Law Group and Arthur E. Mertes, State of Illinois, Circuit Court of Cook County, June 2009
- Arbitration Testimony in Global Link Logistics, Inc., GLL Holdings, Inc., and Golden Gate Logistics, Inc., v. Olympus Growth Fund III, L.P., et al., American Arbitration Association, October 2008
- Arbitration Testimony in Sarah Sanford v. Society of Actuaries & Bruce Schobel, American Arbitration Association, August 2008
- Hearing Testimony in Chinitz v. Chinitz, State of Michigan, Circuit Court for the County of Oakland, May 2008
- Arbitration Testimony in BP Products North America, Inc. v. Laidlaw Educational Services, JAMS Arbitration, October 2007

**Deposition Testimony**
- Paul E. Dubuque v. Dubuque Coffee Co., LLC and Charles T. Dubuque, State of Illinois, Circuit Court of Cook County, October 2021
- Winamac Southern Railway Company v. Irving Materials, Inc., State of Indiana, County of Howard, October 2021
- Brooke Smith v. The Ohio State University, Court of Claims for the State of Ohio, September 2021
- H&T Fair Hills, Ltd., et al. v. Alliance Pipeline L.P., United States District Court, District of Minnesota, April 2021
- Thomas P. Gorczynski, et al. v. Electrolux Home Products, Inc., et al., United States District Court, District of New Jersey, Camden Division, February 2020
- Thomas Allegra, et al. v. Luxottica Retail North America, United States District Court, Eastern District of New York, Brooklyn Division, December 2019
- Sdahrie Howard, et al. v. Cook County Sheriff's Office and County of Cook, United States District Court, Northern District of Illinois, Eastern Division, April 2019
- In re: Whole Foods Market Group, Inc. Overcharging Litigation, United States District Court, Southern District of New York, January 2019



- WHB International, Inc. and WHB Fundição, S/A v. Allison Transmission, Inc., Marion Superior Court, Indiana Commercial Court, December 2018
- Teresa Elward, et al. v. Electrolux Home Products, Inc., United States District Court, Northern District of Illinois, Eastern Division, August 2018
- Roger Coffelt, Jr., et al. v. The Kroger Co., The Pictsweet Company and CRF Frozen Foods LLC., et al., United States District Court, Central District of California, Riverside Division, May 2018
- Rick Lindsey v. Officer Michael Orlando, Officer Jamie Falardeau, the City of Chicago, Delta Airlines, Thomas Steinfels, and Marcella Pirvu, United States District Court, Northern District of Illinois, Eastern Division, March 2018
- Syncora Guarantee Inc. v. Alinda Capital Partners, LLC, American Roads LLC, Macquarie Securities (USA) Inc., and John S. Laxmi, Supreme Court of the State of New York, County of New York, December 2017
- Kelley Antekeier v. Laboratory Corporation of America, United States District Court, Eastern District of Virginia, Alexandria Division, November 2017
- Topix Media Lab, LLC, v. Athlon Sports Communications, Inc., American Arbitration Association, October 2017
- Christine Ekalliipse Mouloki v. Marie Paule Epee and Eric Ngado Epee, United States District Court, Northern District of Illinois, Eastern Division, July 2017
- Syngenta Crop Protection, LLC v. Willowood, LLC, Willowood USA, LLC, Willowood Azoxystrobin, LLC, and Willowood Limited, United States District Court, Middle District of North Carolina, September 2016
- In re: Hardieplank Fiber Cement Siding Litigation, United States District Court, District of Minnesota, February 2016
- In re: Atlas Roofing Corporation Chalet Shingle Products Liability Litigation, United States District Court, Northern District of Georgia, December 2015
- Churchill Downs Incorporated v. Illinois Department of Revenue, Brian Hamer, as Director of The Illinois Department of Revenue, and Dan Rutherford as Treasurer of the State of Illinois, State of Illinois, Circuit Court of Cook County, August 2014
- Victor Tracy, Power of Attorney for Anne Tracy and Victor Tracy, Individually v. Robert K. Erickson, M.D., Lake County Neurosurgery, LLC, Advocate Condell Medical Center, State of Illinois, Circuit Court of Cook County, July 2014



- Marylee Arrigo v. Link Stop, Inc., et al., United States District Court, Western District of Wisconsin, October 2013
- Andrew C. Dillon v. Transportation Solutions Group, LLC, Freight Exchange of North America, LLC, 3PLogic, LLC, Transportation Solutions Enterprises, LLC and Todd Berger, United States District Court, Northern District of Illinois, Eastern Division, September 2013
- Grater, Inc., and James T. Zavacki v. Kevin T. Keating and Keating & Shure, Ltd., State of Illinois, Circuit Court of Cook County, September 2013
- Think Tank Software Development Corporation et al. v. Chester Inc., et al., State of Indiana, County of Porter, February 2012 & October 2009
- Continental Datalabel, Inc. v. Avery Dennison Corporation, United States District Court, Northern District of Illinois, Eastern Division, December 2011
- Ross v. Ross, Circuit Court of the Nineteenth Judicial Circuit, Waukegan, Lake County, Illinois, September 2011
- In re: IKO Roofing Shingle Products Liability Litigation, United States District Court, Central District of Illinois, Urbana Division, August 2011
- Jessica Ellen Legens, et al. v. Mark Alan Ikerman and Manheim Services Corporation, d/b/a Manheim Gateway St. Louis, et al., State of Illinois, Circuit Court of Madison County, November 2010
- Ronald Seymour v. Wausau Signature Agency, et al., United States District Court, Northern District of Illinois, Eastern Division, May 2010
- Neil Simon and Clarissa Simon v. Heritage Title Company, State of Illinois, Circuit Court of Cook County, December 2009
- Mario Vara v. Integra Properties, Inc., Abe Polatsek, S&M Corporation and Michael Strick, State of Illinois, Circuit Court of Cook County, December 2009
- Saint-Gobain Autover USA, Inc., et al. v. Xinyi Glass North America, Inc., et al., United States District Court, Northern District of Ohio, Eastern Division, October 2009
- Sleepy's LLC, v. Select Comfort Wholesale Corporation, et al., United States District Court, Eastern District of New York, July 2009
- Indeck Power Equipment Company v. Professional Power Products, et al., State of Illinois, Circuit Court of Cook County, September 2008
- NSM Music Group, Ltd. and NSM Music, Inc. v. Synergy Law Group and Arthur E. Mertes, State of Illinois, Circuit Court of Cook County, May 2008



- Maria Belbis, et al. v. County of Cook, United States District Court, Northern District of Illinois, Eastern Division, January 2008
- Bucyrus International, Inc. v. Price Erecting Company and Kentucky Rebuild Corp., State of Wisconsin, Circuit Court of Milwaukee County, October 2007
- Mark A. Sindecuse, M.D. v. Dean M. Katsaros, Katsaros & Associates, and CIB Marine Bancshares, Inc., United States District Court, Eastern District of Missouri, Eastern Division, June 2007
- Quentin Bullock et al., v. Michael Sheahan and Cook County, United States District Court, Northern District of Illinois, Eastern Division, September 2006

**Awards**
- National Science Foundation Grant, 1998
- Old Gold Research Fellowship, University of Iowa, Summer 1997
- Outstanding Professor, University of Iowa Panhellenic Council, Fall 1996
- Doctoral Teaching Award, Kellogg Graduate School of Management, 1994

**Professional Memberships**
- American Bar Association (Associate Status)
- American Statistical Association
- Credit Research Foundation (Research Fellow)

**Publications**
- "Does (Sample) Size Matter" *For the Defense*, February 2019
- "The U.S. Federal Crop Insurance Program in 2012 and Beyond," (with Frank Schnapp) *Trébol*, July 2013
- "Profitability & Effectiveness of the Federal Crop Insurance Program," (with Laura Carolan & Frank Schnapp), *Crop Insurance Today*, 44(2), pp. 28 – 32, May 2011
- "Economic and Accounting Analyses in Post-Acquisition Disputes," (with Allen Burt and Matthew Paye) *The SRR Journal*, Spring 2010
- "Statistical Analyses Relation to Reductions In Force," *The SRR Journal*, Spring 2009
- "Antitrust Analyses in Horizontal Mergers," (with Thomas R. Jackson) *The SRR Journal*, Fall 2007
- "Options Backdating: The Latest Corporate Imbroglio," (with Idris Raja) *The SRR Journal*, Spring 2007 (reprinted on mondaq.com)



- "Multi-Unit Auctions: A Comparison of Static and Dynamic Mechanisms" (with Alejandro Manelli and Martin Sefton), *Journal of Economic Behavior and Organization*, 61(2), pp. 304 – 323, October 2006
- "The Exploitation of Relationships in Financial Distress: The Case of Trade Credit," *Journal of Finance*, February 2000
- "Everything you always wanted to know about discounting, but were afraid to ask: A Finance 101 Primer," *Credit and Financial Management Review*, Summer 1999
- "Paying Your Bills: The Effect of Corporate Quality" September 1996
- Refereed for the *American Economic Review*, *American Real Estate Society*, *Journal of Finance*, the *Journal of Business, Finance and Accounting*, and John Wiley Publishers



| Main Campus ULV Various Other Fees [1] | |
|---|---|
| **Fee** | **2019-2020** |
| APA fee (doctoral students) | $100 |
| Appeals | $50 |
| Application, undergraduate, credential and Master's (non-refundable) | $50 |
| Application, Doctoral (non-refundable) | $75 |
| Assessment Testing Kit Fee | $50 |
| Auditing, (traditional undergraduate students) per semester hour | $630 |
| Auditing, per semester hour…one-half normal tuition Authentication Certificate (Apostille) | $80 - $110 |
| Cap and Gown Fee (doctoral students) | $80 |
| Community Service Alternative Assessment | $50 |
| Competency Exam (CBPM) | $100 |
| Continuous Registration (Psy.D. & Ed.D.) 1-2 semester hours of tuition | $1,175 - $2,350 |
| Continuous Registration (D.P.A.), per term | $783 - $1,566 |
| Course Challenge | 1 semester hr. of tuition |
| Doctoral Dissertation completion | $450 |
| Graduation, Doctoral | $300 |
| Graduation, Master's | $160 |
| Graduation, Undergraduate | $140 |
| Health Center (mandatory for all international graduate students & all other students who qualify & purchase the Health Insurance Plan separately), per semester | $75 |
| Health Center (mandatory for all international graduate students & all other students who qualify & purchase the Health Insurance Plan separately), per term | $60 |
| Health Insurance (mandatory for all international graduate students), per semester | $466 |
| Health Insurance (mandatory for all international graduate students), per term | $277 |
| Journalism, Radio, TV Lab Fee(s) | $150 |
| Biology/Anthropology 350L, 360L, 394 | $100 |
| Kinesiology Lab Fees | $50 - $100 |
| Laboratory Fee, per course | $150 |
| Late Financial Arrangement | $100 - $300 |
| Legal Studies Certificate | $35 |
| Legal Studies Association (one time charge) | $25 |
| Legal Studies, online research, per course | $20 |
| Lost ID card | $5 |
| Make-up Examination | $40 |

[1] ULV 000034-273 (2019-2020 Catalog).pdf, p. 36-37 (ULV 000069-70) .

| Main Campus ULV Various Other Fees [1] | |
|---|---|
| **Fee** | **2019-2020** |
| MSAT Multipurpose Fee (per year) [2] | $1,000 |
| Missed Payment Fee | $35 |
| Music Lessons, per semester hour | $250 |
| Music 345 Lab | $50 |
| Photography Laboratory | $175 |
| Professional Development Courses (700-level, non-degree credit), per semester hour | $125 |
| Registration (not charged to full-time, traditional-age students), per course | $30 |
| Replacement of Diploma | $60 |
| Returned Check/Rejected Credit Card | $25 |
| RICA Test Preparation | $100 |
| Senior Citizens Audit Program (Per Course) | $50 |
| Student Orientation Fall | $100 |
| Student Orientation Spring | $45 |
| Student Tuition Deposit (non-refundable)* | $200 |
| Taskstream Account Misuse | $27 - $70 |
| Teacher Performance Assessment* | $50 - $100 |
| TPA Late Fee | $50 - $100 |
| Transcript, per copy | $10 |
| Transcript sent certified, per copy | $15 |
| Transcript (rush), per copy | $20 |
| Transcript, special mailing/handling requests | $35 |
| Transitional Kindergarten Certificate (non-degree credit), per semester hour | $150 |
| Written Composition | $50 |

[2] MSAT CPR/AED, MSAT BOC Practicum Exam, MSAT Live Scan, MSAT Mini Medical Kit with supplies, MSAT NATA Dues & ATRACK Access, MSAT Professional Attire/Uniform.

EXHIBIT D