**CONFIDENTIAL**

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

BRIANNA ARREDONDO, on behalf of herself and all others similarly situated,

                      Plaintiff,

    vs.

THE UNIVERSITY OF LA VERNE,

                      Defendant.

No.: 2:20-cv-07665-MCS-RAOx

---

## EXPERT REPORT OF CHARLES D. COWAN, PH.D.

### January 18, 2022

**CONFIDENTIAL**

# Table of Contents

I.      Introduction ......................................................................................................................... 2

II.     Professional Qualifications and Compensation ................................................................ 3

    A.    Professional Experience ............................................................................................ 4

    B.    Experience in Academia ............................................................................................ 4

    C.    Publications ................................................................................................................ 5

    D.    Professional Societies ................................................................................................ 5

    E.    Compensation ............................................................................................................ 5

III.    Damage Computations ..................................................................................................... 6

    A.    Class Member Damages Calculations ....................................................................... 6

    B.    Estimate of Tuition Damages Calculations Based on Available Data .............................. 12

IV.     Conclusions ...................................................................................................................... 14

CONFIDENTIAL

## I.  Introduction

1.  I have been retained by Shoop Law, Charon Law, the Sultzer Law Group, and Leeds Brown Law, co-counsel for the proposed class ("Plaintiff") in this action against the University of La Verne ("Defendant" or "ULV").  I was asked to evaluate the loss to students enrolled at the main campus at La Verne due to switching from in-person, campus-based educational services to on-line only services during the latter half of the Spring Semester offered at La Verne in 2020.

2.  Further, I was asked to quantify the losses incurred by each student, including prejudgment interest, on classes that were switched from in-person, campus-based services to on-line only for students who contracted for educational services at La Verne's Main or Central Campus.

3.  This report summarizes analyses I conducted and the conclusions I developed based on these analyses. The materials on which I relied for purposes of this report are listed in Exhibit 3.

4.  At this point detailed information has been produced only with respect to the Plaintiffs' representative, Ms. Arredondo.  Detailed information similar to that provided for Ms. Arredondo has not been produced for other class members, including any information on fees. My understanding is that, should the class be certified, this information will be made available in production as part of discovery.  There is, additionally, aggregate information that was produced either by Defendants or gathered

CONFIDENTIAL

by Plaintiffs' Counsel.  In Section III-A, I provide a framework for calculating damages for each member of the class using a single formula and present this calculation for the named plaintiff.

5.  In Section III-B, I provide the calculation of damages for the class as a whole based on the information that Defendant have produced to date.  I note that some of the aggregate data provided by the Defendant is unclear in terms of what it covers and some of it seem to contain errors.  I make some assumptions regarding the meaning of data items provided by Defendant.  As part of discovery, I expect that inconsistencies in the data provided by the Defendant will be resolved.

6.  As I expect to receive more materials from discovery should this class be certified or compelled by the Court as part of the pending discovery dispute, I reserve the right to amend this report when more fulsome information becomes available to me.

## II.  Professional Qualifications and Compensation

7.  I have over fifty years of experience in statistical research and design.  I received my Bachelor of Arts degree in Economics from the University of Michigan, my Master of Arts degree in Economics from the University of Michigan, and my doctorate in Mathematical Statistics from the George Washington University.  I currently consult for numerous public and private sector entities on the design, implementation, and evaluation of research, and the synthesis of statistical and sampling techniques for

CONFIDENTIAL

measurement. My professional experience and academic tenure are included in my curriculum vitae, a true and correct copy of which is attached as Exhibit 1.

### A.  Professional Experience

8.  I have designed numerous large and complex research programs. These include the Post Enumeration Program for the U.S. Census Bureau to evaluate the Decennial Census, the Economic Cash Recovery valuations conducted by the Resolution Trust Corporation ("RTC"), and evaluation studies conducted for the Department of Justice, the Department of Defense, and the Department of the Treasury.

9.  From January 2002 to the present, I have been a Member of Analytic Focus LLC. My firm provides analytic services in the public and private sectors. My firm has multiple projects with the federal government involving audits and other review services. The firm helps businesses and nonprofits optimize their operations and estimate the economic impact of their activities. Included in the firm offerings are expert witness and consulting services in litigation. A list of cases in which I have given expert testimony during the previous four years is attached as Exhibit 2.

### B.  Experience in Academia

10. I have taught graduate and undergraduate courses in sampling theory, statistics, and computational methods for analysis. I recently retired from my position as Professor in the School of Public Health at the University of Alabama at Birmingham.

CONFIDENTIAL

11. I also served as an Associate Professor of Statistics at George Washington University from 1993 to 1998, served as a Visiting Research Professor at the Survey Research Laboratory of the University of Illinois from 1983 to 1989, and was on the faculty of the School of Public Health at the University of Alabama Birmingham from 2002 to approximately 2017.

## C.  Publications

12. I have co-authored two books: one on evaluation of survey and census methods, and one on econometric measures related to the welfare of the U.S. economy.  I also have written numerous articles on statistical methods, sampling, rare and elusive population research, and optimization techniques.  A listing of these publications is included at pages 4 to 7 of my curriculum vitae, attached as Exhibit 1.

## D.  Professional Societies

13. I am a member of the American Statistical Association and have held memberships in other professional societies.  My positions on professional committees are listed at page 3 of my C.V., attached as Exhibit 1.

## E.  Compensation

14. I am being compensated for my work on this engagement at the rate of $775 per hour for my time.  The payment of my fees is not contingent on the opinions I express in connection with this engagement.

CONFIDENTIAL

## III. Damage Computations

### A. Class Member Damages Calculations

15. The Plaintiff alleges that the "breach was the retention of the full amount of tuition and the majority of fees when it could not provide in-person, on-campus educational services."[1] The "harm alleged is the failure to receive a pro-rated refund of tuition and fees when Plaintiff received remote-only education for a materials portion of the semester."[2]

16. In brief, my calculation of damages, described in the next few paragraphs, is based on a partial allocation of tuition and fees to two time periods:  before and after the closure of La Verne's main campus due to COVID.  Prior to the closure of the main campus all services offered by La Verne were available and are so credited.  After the closure of the main campus, only on-line courses were offered, and labs and other fee-based services were not available.  However, La Verne offers on-line courses at a lower rate, so I apply this rate to course hours to compute what La Verne should charge in tuition for on-line offerings.  I use these two numbers to compute damages.

17. The price of undergraduate tuition for full-time in-person education at University of La Verne's main campus for 12 – 23 credit hours of tuition was of $21,720 ("In-person Full-Time Tuition Price").[3]  The price of undergraduate tuition for part-time in-person education at University of La Verne's main campus was of $1,260 per credit ("In-Person

---

[1] Plaintiff's Reply Memorandum in Support of Plaintiff's Motion For Class Certification at p4.
[2] Plaintiff's Reply Memorandum in Support of Plaintiff's Motion For Class Certification at p4.
[3] See Course Catalog at ULV 000067.

**CONFIDENTIAL**

Part-Time Tuition Price"). These prices were set by University of La Verne and are the prices for which students contracted with University of La Verne. I refer to the In-person Full-Time Tuition Price and In-Person Part-Time Tuition Price together as the In-person Tuition Price.

18. Likewise, the price for online education at La Verne Online per credit hour was of $645 ("Online Tuition Price").[4] Once more, this is the price that La Verne set for online credit hours and the price at which students that took online classes contracted for. I note that according to University of La Verne:

- "La Verne Online is a top-ranked online school with both bachelor's and master's degree programs available through the University of La Verne. These programs ... are taught by University of La Verne's experienced faculty in a way that is both flexible and convenient."[5]
- La Verne Online is a program that "offers courses online leading to select La Verne degrees."[6]
- "The Regional and Online Campuses provide teaching credentials, associate, bachelor and master degrees",[7] including B.A degrees in Business Administration, Criminal Justice, Educational Studies, Information Technology, Public Administration.[8]
- "The University of La Verne extends well beyond the campus drawn up in 1981 [and] [w]herever you are, a degree from the University of Laverne is nearby (emphasis added)."[9] listing under this statement "La Verne Online".[10]

---

[4] See Course Catalog at ULV 000068.
[5] La Verne Online | University of La Verne (Accessed 1/16/2022).
[6] See La Verne Course Catalog at ULV 000044.
[7] See La Verne Course Catalog at ULV 000044.
[8] See La Verne Course Catalog at ULV 000045.
[9] Locations Throughout California | University of La Verne (Accessed 1/16/2022).
[10] Locations Throughout California | University of La Verne (Accessed 1/16/2022).

**CONFIDENTIAL**

19. Nowhere in the University of La Verne Course Catalog did I find that a degree obtained through La Verne Online is any different from a degree that could be obtained by taking courses at the main campus.

20. In this case, students who initially contracted for on campus and in-person educational services at the main campus received those services for a partial portion of the semester. Then they were moved to online education. For students that contracted for on-campus educational services at the main campus, the Spring 2020 semester started on February 3rd and should have ended on May 31st, 2020.[11] On March 16, 2020, however, classes were moved to an online only modality.[12] Thus, for approximately 64% semester the educational services were provided entirely online.[13]  I refer to this as the "Online Portion".  I refer to remaining portion of the semester or 36% as the "In-Person Portion".

21. This computation is made more difficult by an earlier offering of a limited number of course hours in January, where a student could opt to take a brief January offering for a few hours with the same tuition charged for January to the end of term.  Those students who did not opt to do this paid exactly the same tuition for February to the end of term.

---

[11] See La Verne Course Catalog at ULV 000038.

[12] See ULV001432 Stating that "Effective Monday, March 16, and until further notice, [ULV] employees are expected to work from home …" and "All classes, including those offered at regional campuses, graduate programs, and the College of Law, will remain online through the end of the spring semester/term" [and] "All university events are suspended, postponed, or will be moved online for the remainder of the spring semester/term."

[13]  Memorandum of Points and Authorities in Support of Plainitff's Motion for Class Certification p. 25 -26.

CONFIDENTIAL

22. If I had this information regarding whether a student took courses in January, I could allocate coursework to January (e.g., 2 credit hours out of 20 in January) and the remainder (e.g., 18 credit hours out of 20 in February through May) so that tuition would extend from January through the end of the term or from February through the end of the term. I currently do not have any records indicating this split, yet it could be easily applied in what follows by simply expanding my algorithm with a single number: number of credit hours taken in January for full-tuition students. I do not do that here in what follows, because this information has not yet been made available in discovery for the undergraduates like the tuition values were.

23. Thus, the value of the education that students received could be calculated as follows:

> a) *Part-Time Student = 1 if "yes" or 0 if "no".*
> b) *Full-Time Student = 1 if "yes" or 0 if "no".*
> c) *Value Received In Person Portion = Full-Time Student \* (In-Person Full-time Tuition Price x In-Person Portion) + Part-Time Student \* (In-Person Part-Time Tuition Price x Credit Hours Taken x In-Person Portion)*
> d) *Value Received Online Portion = Online Tuition Price x Credit Hours Taken x Online Portion*
> e) *Total Value Received = Value Received In Person Portion + Value Received Online Portion*

24. From the Total Value Received, I subtract the subsidies or discounts provided by University of La Verne, including scholarships and grants ("ULV Subsidies") to arrive at the

9

CONFIDENTIAL

"but-for" payment.[14]  This is the portion of the value received that the student would have covered from their own pocket or resources.   Damages is the difference between the actual payment made by the students and the "but-for" payment.

  f)  *Actual Payment = In-Person Tuition Price[15] – ULV Subsidies*
  g)  *But For Payment = Total Value Received – ULV Subsidies*
  h)  *Amount Overpaid = Actual Payment – But For Payment.*

25. I summarize this calculation for the plaintiff Ms. Arredondo (who was a full-time student) in the table below.   I can calculate Damages for Ms. Arredondo because Defendants have provided all data points required for her.

**Table 1: Calculation of Tuition Damages for the Named Plaintiff: Ms. Arredondo**

| Description | Dollar |
|---|---|
| Value Contracted For | $21,720.0 |
| Online price for total hours taken | $12,900.0 |
| Value received (in-person portion of semester) | $7,819.2 |
| Value received (online portion of semester) | $8,256.0 |
| Value received | $16,075.2 |
| Total La Verne Subsidies | $12,300.0 |
| But for payment | $3,775.2 |
| Amounts paid and not subsidized by ULV | $9,420.0 |
| **Amount Overpaid** | **$5,644.8** |
| **Prejudgment Interest** | **$1,185.4** |
| **Damages (Including Pre-Judgment Interest)** | **$6,830.2** |

26. The Amount Overpaid in paragraph 24-h times $(1+r)^2$ is approximately the damages incurred by each student plus prejudgment interest. The value r is an annual

---

[14] I do not subtract "Pell Grants" or amounts provided though the "ULV Emergency Fund". I understand from Plaintiffs' Counsel that these are not tuition discounts that are provided by University of La Verne but rather by other entities and that the students could have used these in other ways instead of for tuition or were specific pandemic related emergency relief funds.

[15] Note that for part-time students this will be the price per hour times number of credit hours taken.

**CONFIDENTIAL**

interest rate for prejudgment interest set by the court[16], and the value (1+r) is squared as the interest is for two years (approximately) since the end of Spring Term 2020. I use the squared amount since the time period will ultimately be established by the court, but the time is approximately two years from May 2020 until the time of this report and discussions between the parties on its contents. I am not saying that the time period should be exactly two years – this is an example. Prejudgment interest is ultimately determined by the court when a judgment is rendered. For now, two years is a good approximation. The sum of this value over all students is the total damages being sought by the plaintiffs.

27. A similar computation can be performed for graduate students taking courses on the Main campus in Spring of 2020. The information for graduate students is less certain in terms of values to be applied based on what one can glean from the La Verne course catalog.[17] The number of graduate students out of the pool of "other" students enumerated by the Defendant is unknown, making it impossible to make a determination of damages for this group. The mathematical computation would be the same once a determination is made for rates charged to graduate students – only the inputs would

---

[16] I have been informed by counsel that the rate in California to be used for interest is 10% per annum, and I will proceed with 10% as an annual rate, but note that my computation is easily changed should the court determine that interest should be computed at a different rate.

[17] The course catalog shows differences in hourly rates or pay structures (per hour versus per term) based on the degree.

CONFIDENTIAL

vary. Once this information is available for graduate students, I propose to add to the overall pool of damages using information obtained in discovery.

28. Finally, Plaintiffs also request for reimbursement of fees. However, fees fall into two general categories: lab fees and health services. For students, the lab fee would be dependent on whether a student took a course that would involve some type of lab work. In this case, I would divide lab fees by prorating them into the pre-closure period and the post-closure period. Pre-closure lab fees would remain unchanged, but post-closure lab fees would be valued as damages at their full amount. For a $100 lab fee where 36% of the term was pre-closure and 64% was post-closure, the $64 dollars prorated from the $100 lab fee would be the damages for a student, as there would be no labs at a closed university. Health service fees would be handled in a similar fashion, but neither can be computed at the present time since this information has not been provided in discovery.

B. Estimate of Tuition Damages Calculations Based on Available Data

29. As discussed, at this point Defendants have not produced the detailed information required above for other students. Because at this point, I do not have this information I have used other data points provided by Defendants or gathered by Counsel for Plaintiff to provide a rough estimate of damages for undergraduate students.[18]

---

[18] I understand from ULV's response to Interrogatory No. 5 that there were another "939 other students who were enrolled for Spring 2020 semester under the Central Campus Semester Calendar…" in addition to those listed as undergraduate students. The information available for this group of students is not available to calculate a rough damages number. It is not clear what "other" reflects. Counsel for Plaintiff informs me that these are graduate students. In either case, the amounts to apply for these students at this point is unclear and addressing this group will require further discovery.

CONFIDENTIAL

30. This is at best a questionable approximation, as I do not know whether the Paid Tuition amounts provided by the Defendant include students studying abroad or other students who would not be properly included in this computation. However, it proves the computation is viable and gives a ballpark for the damages amount.

31. Calculation of damages based on total figures is based on only two pieces of information provided by the Defendant, (i) the total count of undergraduate students during Spring 2020, 2,787; and (ii) ULV's "gross tuition assessment (not receipts)" corresponding to these students, $47,211,465. (ULV's response to Interrogatory No. 5.)

32. In addition, these two figures appear to be inconsistent with each other. If I apply the published tuition rate to the 2,787 undergraduate students, I obtain a different number than the "gross tuition assessment" ($47,211,465) reported by the Defendant. There is no explanation why there would be a discrepancy as this is a relatively simple multiplication to perform.

33. As a result, my damages estimation based on total figures relies on several assumptions and scenarios. In all scenarios, I consider that the proportion of Spring 2020 when classes were delivered as contracted was 36%. When I consider the two values (i) and (ii) provided by ULV, total damages range from $14,429,453 to $15,900,672, depending on whether the average number of credit hours taken by part-time students is three or nine. When I consider the value (i) as provided by ULV but impute gross tuition assessment, total tuition damages range from $17,606,794 to $19,009,584, depending on

**CONFIDENTIAL**

whether the average number of credit hours taken by part-time students were three or nine. When I take into consideration prejudgment interest, my total calculation of damages is between $17,459,638 and $19,239,813 if I use both inputs described in paragraph 32; and between $21,304,220 and $23,001,597 when I use only the number of students reported by Defendants and I estimate receipts.

34. This calculation will be refined, once I receive the inputs necessary for each of the students as I could apply the formulas utilized to arrive at the damages for Ms. Arredondo to all members of the class and sum across them to arrive at a more precise calculation of damages. I will also consider the inclusion of graduate students and additional damages arising from fees that were paid for services that were not rendered.

## IV. Conclusions

35. As seen in the previous section, there is a viable methodology for computation of damages, the amount can be approximated now using the partial production from the Defendant, and a methodology is available for refining the estimated damages once discovery is complete.

36. The range of estimates of total tuition damages produced here, before applying prejudgment interest, is $14.4 million to $19.0 million. When I apply pre-judgement my estimate of damages is between $17,459,638 and $23,001,597.

**CONFIDENTIAL**

January 18, 2022
San Antonio, TX

_____
Charles D. Cowan, Ph.D.