# EXHIBIT A

# EXHIBIT A

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                   WESTERN DIVISION

4        THE HON. MARK C. SCARSI, JUDGE PRESIDING

5

6    Brianna Arredondo,              )
                                     )
7                     Plaintiff,     )
                                     )
8              vs.                   ) No. 2:20-CV-07665-MCS
                                     )
9    University of La Verne,         )
                                     )
10                    Defendant.     )
     _____)

11

12

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               Los Angeles, California

17             Monday, December 12, 2022

18

19

20

21

22

23          Wil S. Wilcox, CSR 9178
        Official U.S. District Court Reporter
24              350 West 1st Street
           Los Angeles, California 90012
25          Email: wil.wilcox@gmail.com

```
 1    APPEARANCES OF COUNSEL:

 2


 3     FOR THE COUNSEL FOR PLAINTIFF AND THE CERTIFIED CLASS:

 4


 5                        Thomas S. Alch, Esq.
                          SHOOP, A PROFESSIONAL LAW
 6                        CORPORATION
                          9701 Wilshire Blvd., Suite 950
 7                        Beverly Hills, California 90212
                          Telephone: (310) 620-9533
 8                        David.shoop@shooplaw.com
                          Thomas.alch@shooplaw.com
 9

10                               - And -

11                        Jason P. Sultzer, Esq.
                          THE SULTZER LAW GROUP P.C.
12                        85 Civic Center Plaza, Suite 200
                          Poughkeepsie, NY 12601
13                        Telephone: (845) 483-7100
                          sultzerj@thesultzerlawgroup.com
14

15                               - And -

16                        Michael A. Tompkins, Esq.
                          Leeds Brown Law, P.C.
17                        One Old Country Road, Suite 347
                          Carle Place, NY 11514
18                        Telephone: (516) 873-9550
                          jbrown@leedsbrownlaw.com
19                        mtompkins@leedsbrownlaw.com

20                               - And -

21                        Perry L. Segal (Pro Hac Vice)
                          Charon Law
22                        303 Twin Dolphin Drive, Suite 600
                          Redwood City, California 94065-1422
23                        Telephone: (650) 542-7935
                          perry.segal@charonlaw.com
24

25
```

```
 1   APPEARANCES OF COUNSEL (Continued):

 2

 3   FOR THE DEFENDANT, UNIVERSITY OF LA VERNE:

 4                       Marlynn P. Howe, Esq.
                         Call and Jensen
 5                       610 Newport Center Drive
                         Suite 700
 6                       Newport Beach, CA 92660
                         Telephone: (949) 717-3100
 7                       Email: mhowe@calljensen.com

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        LOS ANGELES, CA.; MONDAY, DECEMBER 12, 2023; 9:18 AM
 2                              -oOo-
 3        THE CLERK:  Calling item number 2, case number
 4   2:20-CV-7665-MCS, Brianna Arredondo versus University of
 5   La Verne.  Counsel, please state your appearances.
 6        MR. ALCH:  Yes.  Good morning, Your Honor.  Tom Alch
 7   for the plaintiffs in Brianna Arredondo and the students
 8   of the University of La Verne.
 9        THE COURT:  Good morning.
10        MR. SULTZER:  Good morning, Your Honor.  Jason
11   Sultzer on behalf of the plaintiffs.
12        THE COURT:  Good morning.
13        MR. TOMPKINS:  Good morning, Your Honor.  Michael
14   Tompkins from Leeds Brown Law on behalf of the plaintiffs.
15        THE COURT:  Good morning.
16        MR. SEGAL:  Good morning, Your Honor.  Perry Segal
17   from Charon Law on behalf of the plaintiffs.
18        THE COURT:  Good morning.
19        MS. HOWE:  Good morning, your Honor.  Marlynn Howe
20   on behalf of defendant University of La Verne.
21        THE COURT:  Good morning.  You're outnumbered this
22   morning, counsel.
23        MS. HOWE:  Yes, I am.
24        THE COURT:  Okay.  So we've got this settlement in.
25   I just had some questions about it.
```

5

1              Let me ask about initially this benefit, the

2    increased financial aid benefit, the 6.348 million that

3    was disbursed in the fall of 2020.

4              There's a claim made that this was as a

5    direct result of this action, and I wanted to dig into

6    that a little bit more because I'm trying to figure out

7    whether to include that as part of the kind of settlement

8    amount to kind of gauge other things like attorneys fees

9    and costs and things.

10             Tell me a little bit about that and how it

11   came about and who got the money and how.

12        MR. SULTZER:  Your Honor, how this all came about

13   was during our preparations for trial and negotiations, we

14   learned of the significant amount of money that went to

15   the students, and it was in the form of scholarships.

16   Some students got $500 scholarships.  Others got $1,000

17   scholarships.  There -- there --

18             About $2 million of it was evenly divided to

19   all the undergraduate students, and then the remainder was

20   given to other students based upon need or based upon, you

21   know, it could be financial need or merit or whatever

22   criteria that the university chose.

23             So the reason why the university gave that

24   back was because of the lawsuit that was filed.  It was

25   given back after the lawsuit was filed and the board -- my

1   understanding is the board of the school made a

2   determination that because of the lawsuit they wanted to

3   get money directly in the hands -- to the students right

4   away.

5            And at that time, I felt as though that the

6   school thought that it would just be too much to settle,

7   you know, we'd want too much more money than that, so they

8   wanted to do something for the students.  So that's how

9   that all came about.

10            So it's not unique or novel in terms of

11   including these types of benefits that happen before an

12   ultimate -- an ultimate settlement to include it in the

13   settlement.  It's sort of like the catalyst theory.  In

14   other words, the lawsuit prompted the -- you know,

15   whatever party in this case, the university, to give the

16   money back to the class early, you know, which I think is

17   a very significant benefit because we were able to get a

18   lot of money back into the hands of class members before

19   we even settled the case.

20       THE COURT:  And so what's the -- what's the evidence

21   in the record that this was because of the lawsuit,

22   though?

23       MR. SULTZER:  Well, I think -- I think in terms of

24   the evidence, this is what the board -- I mean, I don't

25   think there's -- I don't know if there's any deposition

 1  testimony.  I'd have to go back and look.  I'm not sure

 2  there's any deposition testimony, but this came more out

 3  during the negotiations in terms of, you know, what moneys

 4  were given back, why, and the reasons.

 5           So that it was a decision by board members to

 6  do this, but I don't think we have direct testimony in

 7  depositions or on the record for that.

 8      THE COURT:  Because, again, I'm just trying to

 9  figure out the -- whether or not we can include it as part

10  of the settlement or not.

11           I know the suit was brought in August of

12  2020, and this money was distributed in the fall of 2020.

13  So it just seems like it's just a few months after the

14  lawsuit was filed.

15           You mentioned that -- or at least you

16  indicated this morning that you thought the board

17  authorized this money because of the lawsuit, but as far

18  as you know, there's no records that link the two,

19  correct?

20      MR. SULTZER:  There's no records that link the two,

21  but it's more of timing, you know.  And I think it's

22  important when you have these types of situations because,

23  you know, I've had these a number of times, and oftentimes

24  they come and you see them a lot in consumer-fraud cases

25  where there's a recall of a product.

8

1          You know, for instance, I just settled the

2   benzene cases, and because of our lawsuit, all of the

3   sunscreen companies began to recall their products.  So we

4   were given credit in our settlement because of the recall,

5   and there's a real value to that to class members.

6          So, again, I think when you look at these

7   situations, the timing of it is very important.  You know,

8   if this happened before the lawsuit was filed, then

9   obviously we couldn't take credit for that.  But the fact

10   that it happened after the lawsuit and the fact that we

11   know, just during our own internal negotiations and

12   discussions, that that was the reason, we were confident

13   and very comfortable, you know, to put this amount in the

14   settlement because we are taking credit for it, and we

15   think it's a significant achievement.

16          I mean, even putting that aside, your Honor,

17   even the new money, the $2 million, I mean, even without

18   that significant increased financial aid, the $2 million

19   alone that we were able to get and the fresh new money

20   what I call, that's still -- you know, in terms of dollar

21   per student, that's still the largest award of any college

22   COVID settlement so far.

23          So far there's about ten college cases that

24   have settled.  They average about $110 to about $300 per

25   student.  In our case we have about 2,000 class members.

1    So we're about over $400 per student.  So just the new

2    money alone with the 2 million is better than any of the

3    other cases that have been settled so far and approved.

4              And we also have, as you know, your Honor,

5    the nonmonetary relief in terms of access to the career

6    service center and the academic service center.  So

7    there's a real value to that.  So I think all three pieces

8    just make this sort of so far the gold standard for the

9    college COVID settlements.

10             And our firm, my firm, the Leeds Brown firm,

11   are involved in probably 50 or so of these cases around

12   the country right now.  So we have a pretty good handle in

13   terms of what's happening in the landscape, and I think

14   this -- this particular settlement, with the robust relief

15   that we have in sort of all three areas, is very

16   significant.

17      THE COURT:  And then so let's talk about the

18   6.3 financial aid benefit.  So that was -- as I understand

19   what you said earlier, so that was every student got some

20   of that money?

21      MR. SULTZER:  So about 97 to 98 percent of the

22   undergraduates received that money.  So it was virtually

23   every -- every student received something.

24             And it's broken down.  So of that 6.3,

25   2 million, about 2 million of it went back to everyone

1  evenly in forms of scholarships, and then the rest was

2  divided upon merit and need so --

3       THE COURT:  So 2 million went evenly to everybody

4  that was enrolled?

5       MR. SULTZER:  Yes.

6       THE COURT:  And we're looking -- when we're looking

7  at the class -- right? -- we're looking at the people that

8  were enrolled in the spring of 2020, and this money was

9  paid in the fall of 2020.  So how many --

10          Do you have any sense as to whether class

11  members that were enrolled in the spring of 2020 may have

12  left the school and so didn't get the benefit in the fall?

13       MR. SULTZER:  My understanding is, your Honor, that

14  could be the discrepancy of like that 3 percent --

15       THE COURT:  Okay.

16       MR. SULTZER:  -- that haven't because we have about

17  97 percent.  So I think the 3 percent is, you know, who

18  didn't receive it is because they weren't there.  But now

19  that, you know, whatever that percentage is -- and it's

20  probably even more -- will get due money on the back end

21  if ultimately the settlement is approved.

22          And I think, Your Honor, if it makes you more

23  comfortable, you know -- and I'm just sort of thinking

24  outside the box -- I mean, we could supplement the record

25  on this with perhaps -- I mean, we'd have to reopen

```
 1  discovery a bit, but we could supplement the record with
 2  testimony from La Verne on this point if you feel there's
 3  an urge for it.
 4            I don't think it's necessary just based on
 5  the timing of this and, you know, what we were able to
 6  learn during our negotiations on this, but if your Honor
 7  would be more comfortable, I think maybe there's something
 8  we could do.
 9       THE COURT:  Let's talk about the -- let's talk about
10  the other components.  So there's the -- there's the
11  2 million of new money, and out of that 2 million in new
12  money, it looks like about 863,000 will be going to the
13  class members, correct?
14       MR. SULTZER:  Correct, Your Honor.
15       THE COURT:  And that's the -- so is this common
16  fund, that's the same thing as this qualified-settlement
17  fund, right?
18       MR. SULTZER:  Yes, Your Honor.
19       THE COURT:  So how much is that?  How is that going
20  to break down per class member?
21       MR. SULTZER:  I think, Your Honor, the way that will
22  work is it will be done more on the back end with the
23  administrator because some of the students didn't pay any
24  money.  They may have had a scholarship, a federal
25  scholarship.
```

1          So it's going to be -- it's going to be a lot

2    of work for the administrator and for us to sort of figure

3    out who paid what out of their own pocket because really

4    the goal here is if you paid money out of your own pocket,

5    you're going to get that -- you'll get all -- you'll get

6    that back.  But if you didn't pay anything and you had a

7    scholarship or something along those lines, then you won't

8    get that back.

9          So we're going to have to -- I can't give you

10   the exact number or breakdown yet because we won't be in

11   that position probably until we get closer to final

12   approval once we get a lay of the land in terms of who

13   submitted claims and what that whole universe looks like.

14        THE COURT:  And, again, we're dealing with about

15   3,000 class members?

16        MR. SULTZER:  It's about 2,000 class members.

17        THE COURT:  2,000 class members.  Okay.

18          Okay.  What about -- so okay.  So that money

19   will go to class members who paid the university?

20        MR. SULTZER:  Correct, Your Honor.

21        THE COURT:  It won't go to class members who didn't?

22        MR. SULTZER:  Correct.

23        THE COURT:  Okay.  The other, this career services

24   center, what are we talking about here, and how do you

25   come up with the 546,000?

1           MR. SULTZER:  Yeah.  So, again, this is -- so this

2      is purely what I call nonmonetary relief because it's two

3      centers.  You have the career service center and the

4      academic center.  So they have access to two different

5      centers.

6                And it was hard really to come up with an

7      exact number of what that is worth in terms of dollars.

8      It is a very valuable resource for the students to be able

9      to continue to use that, particularly if they graduated

10     with the whole career service center but hard to come up

11     with a number.

12               So what we did is we just took their budget,

13     you know, for the centers, you know, the university's

14     budget, and we looked at the budget, and then we kind of

15     tried to piece it together.  But certainly it's not

16     perfect math; it's just more of -- I don't think anyone's

17     going to be able to value that perfectly, Your Honor.

18          THE COURT:  Okay.  So essentially students that

19     may -- that are no longer students but part of the class,

20     they'd have access to this career services center?

21          MR. SULTZER:  Correct, Your Honor.

22          THE COURT:  And is there any -- are there going to

23     be any changes to the career services center?  In other

24     words, is the university going to have to hire additional

25     counselors or -- you know, to handle this -- sort of the

1    additional students, or is this just saying that these

2    students can use the career services center as it

3    currently exists?

4        MR. SULTZER:  Well, I think -- I think as it stands

5    as it currently exists, but I think certainly if there's a

6    huge -- if everyone's taking advantage of the career

7    service center, I think the university -- obviously,

8    they're going to have to relook in terms of staffing and

9    stuff.

10        But my understanding at this point is it's

11   just going to sort of stay the same in terms of what they

12   have, and then they'll see if anyone's going to take

13   advantage of it.

14       THE COURT:  And how long do these people -- how long

15   do you propose these people have access to it?

16       MR. SULTZER:  You know, I was looking at that

17   myself, Your Honor, and I didn't see a timeline on that,

18   and that was one thing that -- there is no timeline.  So I

19   think it's infinity.

20       THE COURT:  Okay.  The attorneys' fees in this case,

21   the 1.1 million, I take it, you know, if I'm looking at a

22   timeline here, the money that was -- the attorneys' fees

23   that were expended post the distribution of the 6.3 are

24   probably the lion's share of the attorneys' fees, correct?

25       MR. SULTZER:  Correct, Your Honor.  And the

1   1.1 isn't all fees, Your Honor, because there's 233,000 of

2   expenses.

3          So what we did was we just took -- 1.1 is the

4   total universe.  So you would subtract 1.1 minus about 233

5   to date for expenses, and that's the attorneys' fees.

6      THE COURT:  Okay.  Okay.  And so let me ask you just

7   some questions about notification.

8      MR. SULTZER:  There is a problem, Your Honor.

9   Maybe I, because it goes to notice, maybe I could raise

10  that quickly now as a housekeeping issue.

11         THE COURT:  Sure.

12     MR. SULTZER:  So in the settlement agreement, we

13  have certain criteria for objectors to meet if they want

14  to object to the settlement.  I think there are seven or

15  eight criteria in the settlement agreement.

16         All of those criteria do not make its way

17  onto the proposed notice plan that's in front of Your

18  Honor so we're going to have to revise that.  You know,

19  assuming your Honor agrees with the plan, we're going to

20  have to fix the notice plan and resubmit that with -- so

21  it matches up exactly with the settlement agreement.

22     THE COURT:  Okay.  And is the administrator going to

23  reach out to these people using their personal email as

24  well as the University of La Verne?

25     MR. SULTZER:  Yes, Your Honor.  So what will happen

1    is we already notified all the class members when the

2    class was certified.  And now what we'll do again is the

3    university -- assuming Your Honor grants preliminary

4    approval, the university will submit a new list with

5    last-known emails.

6              I'm not sure if that's a university address.

7    Some people may have graduated, and they don't use that

8    address.  So they'll have last-known email and address,

9    and from that list, the claims administrator will resend

10   notice to everyone.

11             I mean, the nice thing about this settlement

12   which is unique, Your Honor, to other class settlements is

13   that everyone's going to get paid no matter what.  So even

14   if no one responds to a notice, you know, they should

15   receive a check.  They have the option to fill out an

16   election form in terms of how they want payment, but even

17   if they don't fill that out, they'll still get a --

18   they'll still get a check.

19             So I think it's just an important note in

20   terms of why I think this is a very good settlement

21   because it's very easy for class members to get paid.

22   They really don't have to do anything.

23        THE COURT:  Yeah, I just wanted to make sure that in

24   reaching out to class members, typically universities have

25   kind of like, you know, campus address and then permanent

1   address and the same thing for email; you have the school

2   email and maybe a personal email.

3            And, you know, I want to make sure that

4   you're reaching class members that are no longer at

5   University of La Verne.  Maybe somebody's from Texas, say,

6   and they're -- they have a university -- they had a local

7   mailing address, but you're going to reach out to their

8   permanent addresses as well?

9        MR. SULTZER:  Yes, Your Honor.

10       THE COURT:  Okay.  I don't think I -- let me ask you

11  this.  You talked about this settlement being kind of the

12  gold standard, and you referenced other matters.

13           What are a couple other cases you would

14  suggest that I look at to satisfy myself that, when you

15  say this is the gold standard, you are actually correct?

16       MR. SULTZER:  Yes, Your Honor.  So I was actually

17  involved and just received final approval in the Emerson

18  case in Massachusetts, and in that case, the total

19  settlement fund was to $2,060,000.

20           There was no, quote, unquote, nonmonetary

21  relief in that case like we have here.  There was no what

22  I call the catalyst theory where we were able to get money

23  back in the hands before we ultimately were settled.  That

24  was just 2.06 -- $2.06 million, and in that case, there

25  were actually over 4,000 class members so that averaged

1  out to about $290 per student.  So that's one that just

2  came down.

3          Then you have Brown University.  That one,

4  they had about 9,000-plus class members, and that came to

5  about $110 per student.

6          And then we have New Hampshire University

7  where there was about 3,000 class members.  The common

8  fund in that case was about 1.25 million so that came to

9  about 270 or -$80 per student.

10          You have Monmouth University.  That was a

11  $1.3 million common fund settlement.  And, again, none of

12  these had the extra nonmonetary relief like we have.  None

13  of them had the accelerated funds as a result of the

14  lawsuit.  The Monmouth University averaged about $138 per

15  student.

16          So there's not one settlement so far that has

17  sort of -- I mean, maybe some have exceeded a little bit

18  in terms of their fresh money that we have, the 2 million.

19  But even if you look at that, when you break it down per

20  student, you know, and figure out just on average what

21  they would get back, it doesn't come close to what we've

22  done here.

23          So, you know, we looked at this closely, Your

24  Honor.  And I've been negotiating and trying these kinds

25  of cases for 25 years, and from my experience with

1    these -- and I've been on both the defense side and the

2    plaintiff side for many years on these cases, it's a very,

3    very good settlement.

4            The increased financial aid is a real

5    benefit.  It's not something that we just pulled out of

6    our hat because, frankly, we didn't need it.  You know, I

7    could have came in here with just the 2 million and said

8    to Your Honor, you know, here's our settlement.  I just

9    would have applied -- you know, I could have just

10   submitted our lodestar essentially, which is more than

11   what we're asking for in fees.

12           So it has nothing to do with fees or

13   anything.  It's a real benefit.  It's a very, very good

14   settlement that I think -- and we've already been -- other

15   plaintiffs' firms have reached out to us and said, wow,

16   you know, that's a really good settlement.  We've given

17   ideas in terms of what they could do in terms of other

18   types of nonmonetary reliefs that they can give back to

19   the class.

20           So it's a strong, robust settlement, and

21   we're very happy that we were able to reach a resolution

22   because, as Your Honor knows, this was a very hard-fought

23   litigation that really came up to the eve of trial

24   essentially.

25           THE COURT:  Right.  Well, thank you.

1    Let me just ask counsel for the University of
2    La Verne, what about the -- what about this 6.3 million
3    being as a result of this lawsuit; can you tell me
4    anything about that?
5        MS. HOWE:  Your Honor, it's just as -- I'm sorry --
6    I know Ms. Dayson.
7            As he said, the lawsuit was a catalyst.
8    Really, they had in the forefront of their mind, the
9    board, that their students which this is a
10   minority-serving institution.  So the very large segment
11   of the student population is low income, and they had at
12   the forefront of their mind always the welfare of their
13   students.
14           And this lawsuit opened their eyes to the
15   idea that they needed to get funds into the students'
16   hands immediately, and they moved swiftly, and that
17   happened.
18           And the board -- the language in the brief
19   tracks the language in the settlement agreement.  The
20   Board of Trustees reviewed the settlement agreement and
21   agreed that that was accurate and signed off on the
22   settlement.
23       THE COURT:  Okay.  It's impressive that the
24   university put that 6.3 million out there as quick as it
25   did.  They should be -- that's a great example to other

```
 1    schools.
 2         MS. HOWE:  And truly it was when they could ill
 3    afford to do so.  They were experiencing a loss of -- I
 4    believe it was $12 million that year from having to refund
 5    housing and everything else.
 6              So it was when they could ill afford to do
 7    so, but they saw the need for it, and they did it.  And
 8    I'm thankful that the plaintiffs acknowledged that in the
 9    settlement agreement.
10         THE COURT:  And are you aware, was what the
11    University of La Verne did, was that common with other
12    schools?  Did other schools do similar things?
13         MS. HOWE:  We represent universities, and I've never
14    seen anything like that.
15         THE COURT:  Okay.  Thank you, counsel.
16              Just let me go back to the plaintiffs.  Have
17    you guys -- have you submitted a Word version of the
18    agreement?
19         MR. SULTZER:  Of the settlement agreement?
20         THE COURT:  Yeah.  Yeah.
21         MR. SULTZER:  I don't think we have a Word version
22    submitted.  Mr. Alch might be able to answer that.
23         THE COURT:  Yeah.  If you could submit a Word
24    version --
25         MR. SULTZER:  Okay.
```

```
 1          THE COURT:  -- in case we need to make any changes.
 2          MR. SULTZER:  And we're also going to have to
 3   resubmit, Your Honor, an order for preliminary approval
 4   because I'm going to have to change the --
 5          THE COURT:  Notice.
 6          MR. SULTZER:  -- language.  Yeah, the notice as
 7   well.
 8          THE COURT:  Yeah.  The proposed order.
 9          MR. SULTZER:  The proposed order.
10          THE COURT:  A Word version of it that we can have,
11   yeah.
12          MR. SULTZER:  Okay.
13          THE COURT:  Okay.  Thank you, counsel.
14          MR. SULTZER:  Thank you, Your Honor.
15          THE COURT:  We'll get something out.
16
17          (At 9:41 a.m. proceedings were adjourned.)
18
19
20
21
22
23
24
25
```

1                          --oOo--

2                       CERTIFICATE

3

4

5          I hereby certify that pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true and

7    correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United

11   States.

12

13   Date:  March 13, 2023

14

15

16                      /S/    WIL S. WILCOX

17                         U.S. COURT REPORTER
                           CSR NO. 9178
18

19

20

21

22

23

24

25

MR. ALCH: [1]
4/6
MR. SEGAL: [1]
4/16
MR. SULTZER:
[32]
MR. TOMPKINS:
[1]  4/13
MS. HOWE: [5]
THE CLERK: [1]
4/3
THE COURT: [40]

**$**

$1,000 [1]  5/16
$1.3 [1]  18/11
$110 [2]  8/24 18/5
$12 [1]  21/4
$138 [1]  18/14
$2 [3]
$2,060,000 [1]
 17/19
$2.06 [1]  17/24
$2.06 million [1]
 17/24
$290 [1]  18/1
$300 [1]  8/24
$400 [1]  9/1
$500 [1]  5/16
$80 [1]  18/9

--oOo [1]  22/18
-oOo [1]  4/2

**/**

/S [1]  23/16

**1**

1.1 [2]  15/3 15/4
1.1 isn't [1]  15/1
1.1 million [1]
 14/21
1.25 [1]  18/8
11514 [1]  2/17
12 [2]  1/17 4/1
12601 [1]  2/12
13 [1]  23/13
1422 [1]  2/23
1st [1]  1/24

**2**

2 million [4]
2,000 [3]
2.06 [1]  17/24
200 [1]  2/12
2020 [6]
2022 [1]  1/17
2023 [2]  4/1 23/13
233 [1]  15/4
233,000 [1]  15/1
25 [1]  18/25
270 [1]  18/9
28 [1]  23/6
2:20-CV-07665-MC
S [1]  1/8

**3**

3,000 [2]  12/15 18/7
303 [1]  2/22
310 [1]  2/7
3100 [1]  3/6
347 [1]  2/17
350 [1]  1/24

**4**

4,000 [1]  17/25
483-7100 [1]  2/13

**5**

50 [1]  9/11
516 [1]  2/18
542-7935 [1]  2/23
546,000 [1]  12/25

**6**

6.3 [3]
6.3 financial [1]
 9/18
6.3 million [1]
 20/24
6.348 [1]  5/2
600 [1]  2/22
610 [1]  3/5
620-9533 [1]  2/7
650 [1]  2/23

**7**

7100 [1]  2/13
717-3100 [1]  3/6
753 [1]  23/5
7935 [1]  2/23

**8**

845 [1]  2/13
85 [1]  2/12
863,000 [1]  11/12
873-9550 [1]  2/18

**9**

9,000-plus [1]  18/4
90012 [1]  1/24
90212 [1]  2/7
9178 [2]  1/23 23/17
92660 [1]  3/6
94065-1422 [1]  2/23
949 [1]  3/6
950 [1]  2/6
9533 [1]  2/7
9550 [1]  2/18
97 [2]  9/21 10/17
9701 [1]  2/6
98 [1]  9/21
9:18 [1]  4/1
9:41 [1]  22/17

**A**

a.m [1]  22/17
about the [1]  20/2
above [1]  23/8
above-entitled [1]

7

23/8

academic [2]  9/6
13/4
accelerated [1]
18/13
access [4]
achievement [1]
8/15
acknowledged [1]
21/8
action [1]  5/5
address [6]
addresses [1]  17/8
adjourned [1]
22/17
administrator [4]
advantage [2]  14/6
14/13
afford [2]  21/3 21/6
agreement [8]
aid [4]
Alch [3]
alone [2]  8/19 9/2
amount [3]
Angeles [3]
answer [1]  21/22
anyone's [2]  13/16
14/12
appearances [3]
applied [1]  19/9
approval [4]
approved [2]  9/3
10/21

areas [1]  9/15

Arredondo [3]
assuming [2]  15/19
16/3
attorneys [1]  5/8
attorneys' [4]
August [1]  7/11
authorized [1]  7/17
average [2]  8/24
18/20
averaged [2]  17/25
18/14
award [1]  8/21

**B**

Beach [1]  3/6
benefit [7]
benefits [1]  6/11
benzene [1]  8/2
Beverly [1]  2/7
Blvd [1]  2/6
board [8]
box [1]  10/24
breakdown [1]
12/10
Brianna [3]
brief [1]  20/18
broken [1]  9/24
Brown [4]
budget [3]

**C**

CA [2]  3/6 4/1

## C

CALIFORNIA [5]
calljensen.com [1] 3/7
campus [1] 16/25
career [8]
Carle [1] 2/17
catalyst [3]
center [12]
centers [3]
CENTRAL [1] 1/2
CERTIFICATE [1] 23/2
certified [2] 2/3 16/2
certify [1] 23/5
Charon [2] 2/22 4/17
charonlaw.com [1] 2/24
chose [1] 5/22
City [1] 2/23
Civic [1] 2/12
claim [1] 5/4
claims [2] 12/13 16/9
class [25]
close [1] 18/21
closely [1] 18/23
closer [1] 12/11
Code [1] 23/6
college [3]

## comfortable [3]
common [4]
companies [1] 8/3
components [1] 11/10
Conference [1] 23/10
confident [1] 8/12
conformance [1] 23/9
consumer [1] 7/24
consumer-fraud [1] 7/24
Continued [1] 3/1
CORPORATION [1] 2/6
counselors [1] 13/25
country [2] 2/17 9/12
COURT [3]
COVID [2] 8/22 9/9
credit [3]
criteria [4]
CSR [2] 1/23 23/17
CV [2] 1/8 4/4

## D

David.shoop [1] 2/8
Dayson [1] 20/6
December [2] 1/17 4/1

## decision [1]
defendant [3]
defense [1] 19/1
deposition [2] 6/25 7/2
depositions [1] 7/7
determination [1] 6/2
dig [1] 5/5
direct [2] 5/5 7/6
disbursed [1] 5/3
discovery [1] 11/1
discrepancy [1] 10/14
discussions [1] 8/12
distributed [1] 7/12
distribution [1] 14/23
DISTRICT [3]
divided [2] 5/18 10/2
DIVISION [1] 1/3
dollar [1] 8/20
dollars [1] 13/7
Dolphin [1] 2/22

## E

early [1] 6/16
easy [1] 16/21
eight [1] 15/15
election [1] 16/16
email [7]
emails [1] 16/5

## E

Emerson [1]  17/17
enrolled [3]
entitled [1]  23/8
Esq [4]
essentially [3]
eve [1]  19/23
evenly [3]
everybody [1]  10/3
everyone [2]  9/25
 16/10
everyone's [2]  14/6
 16/13
evidence [2]  6/20
 6/24
exceeded [1]  18/17
exists [2]  14/3 14/5
expended [1]  14/23
expenses [2]  15/2
 15/5
experience [1]
 18/25
extra [1]  18/12
eyes [1]  20/14

## F

fact [2]  8/9 8/10
fall [4]
federal [1]  11/24
fees [8]
figure [4]
fill [2]  16/15 16/17
final [2]  12/11

financial [5]
firms [1]  19/15
fix [1]  15/20
forefront [2]  20/8
 20/12
foregoing [1]  23/6
form [2]  5/15 16/16
format [1]  23/9
forms [1]  10/1
fought [1]  19/22
frankly [1]  19/6
fraud [1]  7/24
fresh [2]  8/19 18/18
front [1]  15/17
fund [5]
funds [2]  18/13
 20/15

## G

gauge [1]  5/8
gmail.com [1]  1/25
goal [1]  12/4
gold [3]
graduated [2]  13/9
 16/7
grants [1]  16/3
great [1]  20/25
GROUP [1]  2/11

## H

Hac [1]  2/21
Hampshire [1]  18/6

handle [2]  9/12
 13/25
happy [1]  19/21
hard-fought [1]
 19/22
hat [1]  19/6
here's [1]  19/8
hereby [1]  23/5
Hills [1]  2/7
hire [1]  13/24
HON [1]  1/4
Honor [34]
housekeeping [1]
 15/10
housing [1]  21/5
Howe [2]  3/4 4/19
huge [1]  14/6

## I

I'd [1]  7/1
I'm [9]
I've [4]
ill [2]  21/2 21/6
immediately [1]
 20/16
impressive [1]
 20/23
income [1]  20/11
increased [3]
infinity [1]  14/19
initially [1]  5/1
instance [1]  8/1
institution [1]

leedsbrownlaw.com/minority-serving

## I

institution... [1]
  20/10
internal [1]  8/11
issue [1]  15/10
item [1]  4/3

## J

Jason [2]  2/11 4/10
jbrown [1]  2/18
Jensen [1]  3/4
JUDGE [1]  1/4
Judicial [1]  23/10

## K

kinds [1]  18/24
knows [1]  19/22

## L

La [10]
La Verne [1]  4/5
land [1]  12/12
landscape [1]  9/13
language [3]
large [1]  20/10
largest [1]  8/21
last-known [2]  16/5
  16/8
LAW [6]
lawsuit [14]
lay [1]  12/12
learn [1]  11/6
learned [1]  5/14
Leeds [3]

[2]  2/18 2/19
lines [1]  12/7
link [2]  7/18 7/20
lion's [1]  14/24
list [2]  16/4 16/9
litigation [1]  19/23
local [1]  17/6
lodestar [1]  19/10
Los [3]

## M

mailing [1]  17/7
March [1]  23/13
Marlynn [2]  3/4
  4/19
Massachusetts [1]
  17/18
matches [1]  15/21
math [1]  13/16
matter [2]  16/13
  23/8
matters [1]  17/12
Maybe I [1]  15/9
MCS [2]  1/8 4/4
member [1]  11/20
members [18]
merit [2]  5/21 10/2
mhowe [1]  3/7
Michael [2]  2/16
  4/13
million [19]
minority [1]  20/10

[1]  20/10
minus [1]  15/4
Monday [2]  1/17
  4/1
Monmouth [2]
  18/10 18/14
months [1]  7/13
Mr [1]  21/22
Ms [1]  20/6
mtompkins [1]
  2/19

## N

necessary [1]  11/4
negotiating [1]
  18/24
negotiations [4]
Newport [2]  3/5 3/6
nice [1]  16/11
none [2]  18/11
  18/12
nonmonetary [5]
notice [7]
notification [1]
  15/7
notified [1]  16/1
novel [1]  6/10
number [6]
NY [2]  2/12 2/17

## O

object [1]  15/14

## O

objectors [1]  15/13
Official [1]  1/23
oftentimes [1]  7/23
oOo [2]  4/2 22/18
option [1]  16/15
order [3]
outnumbered [1]
 4/21

## P

P.C [2]  2/11 2/16
page [1]  23/9
part [3]
party [1]  6/15
pay [2]  11/23 12/6
payment [1]  16/16
people [5]
percentage [1]
 10/19
perfect [1]  13/16
perfectly [1]  13/17
perhaps [1]  10/25
permanent [2]
 16/25 17/8
Perry [2]  2/21 4/16
perry.segal [1]  2/24
personal [2]  15/23
 17/2
piece [1]  13/15
pieces [1]  9/7
Place [1]  2/17
plaintiff [3]

plaintiffs [6]
plaintiffs' [1]  19/15
plan [3]
Plaza [1]  2/12
plus [1]  18/4
pocket [2]  12/3
 12/4
point [2]  11/2 14/10
population [1]
 20/11
position [1]  12/11
post [1]  14/23
Poughkeepsie [1]
 2/12
preliminary [2]
 16/3 22/3
preparations [1]
 5/13
PRESIDING [1]
 1/4
Pro [1]  2/21
problem [1]  15/8
proceedings [3]
product [1]  7/25
products [1]  8/3
PROFESSIONAL
[1]  2/5
prompted [1]  6/14
proposed [3]
pulled [1]  19/5
purely [1]  13/2
pursuant [1]  23/5

## Q

qualified [1]  11/16
qualified-settlement
 [1]  11/16
questions [2]  4/25
 15/7
quick [1]  20/24
quickly [1]  15/10
quote [1]  17/20

## R

raise [1]  15/9
reach [3]
reached [1]  19/15
reaching [2]  16/24
 17/4
record [4]
records [2]  7/18
 7/20
Redwood [1]  2/23
referenced [1]
 17/12
refund [1]  21/4
regulations [1]
 23/10
relief [5]
reliefs [1]  19/18
relook [1]  14/8
remainder [1]  5/19
reopen [1]  10/25
Reporter [2]  1/23
 23/17
REPORTER'S [1]

## R

REPORTER'S... [1] 1/15
resend [1] 16/9
resolution [1] 19/21
resource [1] 13/8
rest [1] 10/1
resubmit [2] 15/20 22/3
result [3]
revise [1] 15/18
Road [1] 2/17
robust [2] 9/14 19/20

## S

satisfy [1] 17/14
SCARSI [1] 1/4
scholarship [3]
scholarships [4]
school [4]
schools [3]
Section [1] 23/5
Segal [2] 2/21 4/16
segment [1] 20/10
sense [1] 10/10
service [5]
services [4]
serving [1] 20/10
settle [1] 6/6
settled [5]
settlement [31]
settlements [2] 9/9

seven [1] 15/14
share [1] 14/24
SHOOP [1] 2/5
shooplaw.com [2] 2/8 2/8
side [2] 19/1 19/2
signed [1] 20/21
situations [2] 7/22 8/7
somebody's [1] 17/5
sort of [1] 18/17
spring [2] 10/8 10/11
staffing [1] 14/8
standard [3]
stands [1] 14/4
state [1] 4/5
STATES [3]
stay [1] 14/11
stenographically [1] 23/7
Street [1] 1/24
strong [1] 19/20
student [11]
students [15]
students' [1] 20/15
submit [2] 16/4 21/23
submitted [4]
subtract [1] 15/4
suggest [1] 17/14

suit [1] 8/11
Suite [5]
Sultzer [3]
sultzerj [1] 2/13
sunscreen [1] 8/3
supplement [2] 10/24 11/1
swiftly [1] 20/16

## T

Telephone [5]
terms [15]
testimony [4]
Texas [1] 17/5
thank [4]
thankful [1] 21/8
theory [2] 6/13 17/22
thesultzerlawgroup.com [1] 2/13
they'd [1] 13/20
thinking [1] 10/23
Thomas [1] 2/5
Thomas.alch [1] 2/8
thought [2] 6/6 7/16
time [1] 6/5
timeline [3]
times [1] 7/23
timing [3]
Title [1] 23/6
Tom [1] 4/6

# T

Tompkins [2]  2/16 4/14
total [2]  15/4 17/18
tracks [1]  20/19
transcript [3]
trial [2]  5/13 19/23
Trustees [1]  20/20
Twin [1]  2/22
typically [1]  16/24

# U

U.S [2]  1/23 23/17
ultimate [2]  6/12 6/12
ultimately [2]  10/21 17/23
undergraduate [1] 5/19
undergraduates [1] 9/22
understanding [3]
unique [2]  6/10 16/12
UNITED [3]
universe [2]  12/13 15/4
universities [2] 16/24 21/13
university [24]
university's [1] 13/13
unquote [1]  17/20

urge [1]  14/12
us [2]  12/2 19/15

# V

valuable [1]  13/8
value [3]
Verne [10]
version [4]
versus [1]  4/4
Vice [1]  2/21
virtually [1]  9/22
vs [1]  1/8

# W

we'd [2]  6/7 10/25
welfare [1]  20/12
West [1]  1/24
WESTERN [1]  1/3
Wil [2]  1/23 23/16
wil.wilcox [1]  1/25
Wilcox [2]  1/23 23/16
Wilshire [1]  2/6
worth [1]  13/7